

# NUMBER 13-12-00605-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MARIA ALMAGUER,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

## On appeal from the 93rd District Court
## of Hidalgo County, Texas.

## OPINION ON REHEARING

### Before Justices Garza, Benavides, and Perkes
### Opinion On Rehearing by Justice Benavides

We issued our original opinion in this cause on April 10, 2014. Both appellant, Maria Almaguer, and the State of Texas filed their respective motions for rehearing. After due consideration, we *sua sponte* withdraw our previous opinion and judgment and substitute the following opinion and accompanying judgment in their place. *See* TEX. R.

APP. P. 19.1. Almaguer's motion for rehearing is denied, and the State of Texas's motion for rehearing is dismissed as moot.

By five issues, Almaguer appeals her convictions for one count of manslaughter, see TEX. PENAL CODE ANN. § 19.04 (West, Westlaw through 2013 3d C.S.), a second-degree felony enhanced to a first-degree felony; one count of murder, see id. § 19.02(b)(3) (West, Westlaw through 2013 3d C.S.), a first-degree felony; and two counts of intentionally or knowingly causing serious injury to a child, each first-degree felonies, see id. § 22.04(e) (West, Westlaw through 2013 3d C.S.). For the reasons stated below, we vacate in part, and we affirm in part.

## I. BACKGROUND

In the early morning hours of June 14, 2008, McAllen police and first responders answered a medical emergency call involving 23-month-old Ismael.[1] One of the responding police officers, Rogelio Castillo, recalled that Ismael was unresponsive and not breathing. Cris Cisneros, a paramedic who transported Ismael to McAllen Medical Center, described Ismael as "flaccid" and "limp" at the scene. Doctors pronounced Ismael dead a short time later.

Later that same day, Ismael's mother, Almaguer, provided a statement to McAllen police about the facts surrounding Ismael's death. In her statement, Almaguer told police that in the evening leading up to his death, Ismael complained to her about stomach pain. Almaguer stated that she attempted to monitor Ismael's health from home, but as the night progressed, Almaguer decided to call 9-1-1 for help because Ismael's health worsened. Almaguer further disclosed to police that Child Protective Services (CPS) and

---

[1] We will use first names throughout this opinion in order to protect the minors' identities.

McAllen Police Investigator Pablo Lopez were already investigating her related to an arm injury that Ismael had suffered three days prior to his death. At the time of her original statement to the police, CPS workers had removed Ismael's siblings from the home.

Norma Jean Farley, M.D., performed an autopsy on Ismael for the State. Dr. Farley opined that Ismael died as a result of blunt force abdominal trauma. Specifically, Dr. Farley noted that Ismael had a "gaping laceration" of his duodenum, which is a part of the small intestine, which led to blood and fecal material spilling into the abdominal cavity. Dr. Farley also observed a "right abdominal wall hematoma with intramuscular hemorrhage," and "right back intramuscular hemorrhage most consistent with a blow(s) to the abdomen" such as by a "punch or kick, etc." In sum, Dr. Farley testified that the manner of Ismael's death was homicide.

After the autopsy findings were disclosed on June 16, 2008, Investigator Lopez obtained an arrest warrant for Almaguer's arrest. Almaguer, however, could not be located. McAllen police later received information from Mexican authorities that Almaguer was located in Mexico and that the Mexican authorities were "ready to return her to the United States." Almaguer was returned to the United States at the Roma, Texas port of entry, where she was arrested and booked at the Starr County Jail.

On June 18, 2008, McAllen police transported Almaguer back to McAllen, where she provided police with another written statement. In this second statement, Almaguer reaffirmed the information given in her first statement, "except the part [about] how my son [Ismael] got hurt." Almaguer stated in her second statement:

> I don't remember but I remember hitting [Ismael] with my right foot on his stomach. [Ismael] fell down but he got up and later stopped crying. I don't know why I did and didn't think I had hurt him that bad. I just kept saying for God to forgive me and I carried him for a bit. I then left him sitting on the floor.

3

The State indicted Almaguer for one count of capital murder, one count of felony murder, and two counts of injury to a child. Almaguer was tried by a Hidalgo County jury and was convicted of one count of manslaughter, a lesser-included offense; one count of murder; and two counts of injury to a child. The jury assessed Almaguer's punishment at life imprisonment for each count, and the trial court ordered the sentences to run concurrently. This appeal followed.

## II.    RIGHT TO REOPEN EVIDENCE

By her first issue, Almaguer asserts that the trial court reversibly erred by not allowing her to reopen her defense for further testimony.

### A.    Standard of Review and Applicable Law

We review a trial court's decision on a motion to reopen evidence for an abuse of discretion. *See Smith v. State*, 290 S.W.3d 368, 373 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). The test for whether the trial court abused its discretion is whether the action was arbitrary or unreasonable. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). A court "shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice." TEX. CODE CRIM. PROC. ANN. art. 36.02 (West, Westlaw through 2013 3d C.S.). "Due administration of justice" requires a showing that the evidence is more than just relevant—it must actually make a difference in the case. *Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003). In other words, a judge is required to reopen the case if the evidence would materially change the case in the proponent's favor. *Id.*

4

## B. Discussion

Immediately after both sides closed and rested, Almaguer requested to reopen the evidence in order for Almaguer to provide additional testimony for the jury. Almaguer argues that the trial court reversibly erred by not allowing her to reopen the evidence in order to "refute the main theories the State was advancing against her" and "refute the claim that [Ismael] was only ill in her care, provide another suspect, and to clarify/explain the questions raised in cross examination regarding the child's injuries and her care of the child." We disagree.

The following relevant exchange took place in the trial court, outside of the presence of the jury, following Almaguer's motion to reopen the evidence:

DEFENSE COUNSEL: My client has instructed me—she's not using these terms, but I guess I would be obligated, based on what my client is telling me, to move to reopen. She has indicated to me and has instructed me that she has additional testimony that perhaps I did not ask that she wants to provide to the jury.

And again, it's contrary to my advice but I'd like to put her on the stand to at least use that as a basis to allow me an opportunity to move to reopen based on her desire to provide additional testimony to the ladies and gentlemen of the jury.

And we have advised her that this perhaps could open other doors, other areas that were not gotten into, and perhaps we did not ask certain questions because we wanted to avoid certain areas, and based on our trial strategy, we have opted for the strategy that we have exercised in this case. And our trial strategy is contrary to what she wants us to do. But I feel compelled to put her on the stand and advise her of that and proceed accordingly.

Almaguer then testified to the following during a voir dire examination by defense counsel:

5

Q. Ma'am, did you hand a paper to [defense co-counsel] about what you wanted to tell the jury?

A. Yes, that is so.

Q. Is this the paper?

A. Yes.

Q. Why don't you just cover real briefly each point that you want to talk about. Will you discuss very briefly each point that you want us to elicit in front of the jury. Go down to number one. What is it about?

A. I want to explain the reason why the child went to the hospital in January.

Q. That's one issue. The second issue?

A. And I also need to explain—well, that was number two what I said first because I was not reading.

Q. What is number one?

A. In reality to explain why the child went to the hospital in January. And also to explain why, in December, why I took then the child to my house. I mean December 2007.

Q. The third one?

A. And I also want the jury to know that while the child was in the custody of Sara Espinoza, I took the child three or four times to the pediatrician.

Q. Next one?

A. And I also want that to be clear and to explain when I took the child to the hospital when he has this little ball over here in his head.

Q. Next one?

A. I want the full report that Jessica made from the very beginning when they took away my children, all my children.

Q. Next one?

6

A.    I also want to be shown the report that [former CPS caseworker] Illiana Moreno did, that the jury be shown that. And one of the most important reasons is that I want to explain, and I also want to say who are all the members of my family that were living in my house, and who are the members of my family that I have seen here, and who are the members of my family that I haven't seen in four years, here at court in the county, and that I haven't seen and neither my family knows anything about that person.

      And this is to me is very important because that person back then was for me very important and instead of asking me for help to investigate this case, then instead I am the one being sitting here.

Q.    What other item?

A.    This is for me very important, extremely important.

Q.    Ma'am, stop. What other item, ma'am?

A.    And also I would like to explain why I didn't like the manner Sarita was taking care of my child, how she took care of it, why I didn't like that.

Q.    What other item?

A.    And what was the reason why I went to the hospital [sic] Edinburg.

Q.    What other items are on the paper?

A.    Where and how I met [Ismael's father] and his family.

Q.    Is that all the concerns on that paper?

A.    Yes.

The trial court denied Almaguer's motion and explained its ruling as follows:

Okay. Ms. Almaguer, your request to reopen is denied. You have had due process in this case. I'm not going to allow you to bring the wheels of justice to a screeching halt. If any one defendant were to try to do what it is you are trying to do, this court and any other court anywhere would only be able to try one case a year. I've heard your request. It's denied.

For the record, your lawyers have done an excellent job. You should have listened to their advice. The evidence is closed and we're in recess.

7

We construe the trial court's ruling as an implicit finding that Almaguer's proposed testimony was unnecessary to the due administration of justice—that is, it would not have made a difference in her case. *See id.* Almaguer's proposed testimony appears to involve topics other than the ultimate question at issue: whether her acts or omissions caused Ismael's death. Having reviewed the voir dire testimony, we conclude that the trial court did not abuse its discretion by denying Almaguer's request to reopen the evidence. *See Mechler*, 153 S.W.3d at 439. Almaguer's first issue is overruled.

### III. MULTIPLE PUNISHMENTS

By her second issue, Almaguer argues that her multiple convictions and punishments violate the constitutional protections against double jeopardy. *See* U.S. CONST. amend. V, XIV; TEX. CONST. art. I § 14. This issue was raised by Almaguer's counsel during the trial court's pronouncement of sentence and was overruled by the trial court; it was raised again in a motion for new trial, which was denied by operation of law on January 3, 2013. *See* TEX. R. APP. P. 21.8(c). The State concedes Almaguer's point on appeal and agrees that only one judgment in this case can stand, and the others must be vacated. Therefore, our sole inquiry in this issue is to determine which of the four judgments of conviction remains. *See* TEX. R. APP. P. 47.1.

### A. Applicable Law

It is undisputed in this case that all of Almaguer's convictions are the "same" for purposes of double jeopardy. When a defendant is convicted of multiple offenses that are the "same" for double-jeopardy purposes, case law tells us that the conviction for the "most serious" offense is retained and the other conviction is set aside. *Ex parte Cavazos*, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006).

8

*Cavazos* overruled prior case law which allowed courts to examine other factors—i.e. degree of the felony, range of punishment, and rules governing parole eligibility and awarding of good-conduct time—as "tie breakers" in retaining the most-serious-offense. *See id.* at 338 (overruling *Landers v. State*, 957 S.W.2d 558, 559–60 (Tex. Crim. App. 1997) (en banc)); *see also* 41 GEORGE E. DIX & JOHN M. SCHMOLESKY, CRIMINAL PRACTICE & PROCEDURE § 19:16 (3d ed. 2013) ("The Court . . . had second thoughts [after *Landers*] about entering the thicket of parole eligibility and awards of good time."). Under *Cavazos*, we look to one factor rather than several in determining the most-serious offense—that is, the most serious offense is the offense with the greatest sentence assessed. *Id.* If the sentences are equal in terms of years, we may look to see if restitution was added as additional punishment, and if so, that is the most serious offense. *See id.* at 338–39.

The court of criminal appeals re-visited this issue two years later, however, in *Bigon v. State*, 252 S.W.3d 360, 372–73 (Tex. Crim. App. 2008). In *Bigon*, the defendant was convicted of multiple offenses for the same conduct, which the Court held violated the double-jeopardy provision. *Id.* at 372. The Court sought to set aside five of the defendant's six convictions under the *Cavazos* test, but the punishment assessed for each conviction was equal. *See id.* at 373. As a result, the court of criminal appeals looked to the degree of the felony for each offense to determine which was most serious. *See Bigon*, 252 S.W.3d at 373. Thus, the court affirmed the defendant's first-degree felony murder conviction and vacated the remaining second-degree felonies. *See id.* The *Bigon* Court further reaffirmed the policy reasons behind applying the "most serious test" to double-jeopardy violations—that is, (1) it eliminates arbitrary decisions based upon the

9

order of the offenses in the charging instrument; and (2) public safety is insured through the deterrent influence of penalties. *Id.* at 373 (citing *Landers*, 957 S.W.2d at 559).

When convictions are of the same punishment and same degree, courts may use other factors in determining the most serious offense. For example, in *Villanueva v. State*, 227 S.W.3d 744, 749 (Tex. Crim. App. 2007), the court of criminal appeals utilized an affirmative finding of use of a deadly weapon in one first-degree felony to vacate another equal first-degree felony where an affirmative finding of use of a deadly weapon was not made.

In *Ruth v. State*, No. 13-10-00250-CR, 2011 WL 3840503, at \*\*6–9 (Tex. App.— Corpus Christi Aug. 29, 2011, no pet.) (mem. op., not designated for publication), this Court faced a situation in which a defendant was subject to multiple punishments for the same offense in violation of the double jeopardy provision. In determining which of three convictions should be retained, we noted that each of the convictions were identical under the *Cavazos*, *Bigon*, and *Villanueva* holdings. *Id.* at \*8. As a result, we faced "an unsettled question" of law, and chose to return to pre-*Cavazos* case law which retained the "first-indicted offense" to "break the tie" when all else was equal, since the court of criminal appeals expressly declined to address the issue in *Cavazos*. *See id.* (citing *Ex parte Cravens*, 805 S.W.2d 790, 791 (Tex. Crim. App. 1991) (en banc); *Ex parte Siller*, 686 S.W.2d 617, 620 (Tex. Crim. App. 1985) (en banc)).

## B. Discussion

Almaguer was convicted of: (1) one count of manslaughter, a lesser-included offense to capital murder and a second-degree felony enhanced to a first-degree felony based upon a finding of "true" that Almaguer had been once before convicted of a felony offense, *see* TEX. PENAL CODE ANN. § 19.04; (2) one count of felony murder, a first-degree

10

felony regardless of enhancements, *see id.* § 19.02(b)(3); (3) intentionally or knowingly causing serious bodily injury to a child by act, a first-degree felony regardless of enhancements, *see id.* § 22.04(e); and (4) intentionally or knowingly causing serious bodily injury to a child by omission, a first-degree felony regardless of enhancements, *see id.* The jury assessed punishment for each count at life imprisonment with a $10,000 fine and no restitution.

First, we are unable to utilize *Cavazos*'s greatest-sentence-only test in this case because the punishment for each conviction is equal. *See Cavazos*, 203 S.W.3d at 338. However, by applying *Bigon* and *Villanueva*, we conclude that Almaguer's manslaughter conviction, as a second-degree felony before enhancements, should be set aside. *See Bigon*, 252 S.W.3d at 372–73. We note that the State takes an identical position in its briefing. Therefore, we hereby vacate Almaguer's conviction of manslaughter under count one of trial court cause number CR-217-09-B. *See id.*

By vacating Almaguer's manslaughter charge, we are now left to determine which one of the three remaining first-degree felonies should be upheld. Here, all three convictions are equal in: (1) the assessment of punishment, *see Cavazos*, 203 S.W.3d at 338; (2) the degree of offense, *see Bigon*, 252 S.W.3d at 372–73; and (3) deadly weapon findings, *see Villanueva*, 227 S.W.3d at 749. Furthermore, we distinguish our holding in *Ruth* and find it inapplicable to this particular case. Generally, when applying the principle in *Ruth*, the conviction that should be affirmed "is the offense named in the first verdict form," and typically will be the offense described in count one of the indictment. *See Ruth*, at *8; *Cavazos*, 203 S.W.3d at 339 n. 8. Here, the offense named in the first verdict form, and likewise described in count one of the indictment was the offense of capital murder, under which the jury found Almaguer guilty of the lesser included offense

11

of manslaughter. However, because we have vacated Almaguer's manslaughter conviction, we are unable to utilize the "first-indicted offense" test in this case.

As a result, we further explore this issue herein because of the continuing lack of clarity in the controlling authorities and recurrent problems in applying these authorities in different scenarios where the offenses are equal no matter which factors are applied to determine the most serious offense. Both Almaguer and the State agree that only one conviction should remain; but neither party directs us to any authority to make that determination on direct appeal. More specifically, the State "defers to this Court" in its briefing.

We have applied all of the existing controlling authority from the majority opinions of the court of criminal appeals, as well as precedent from this Court, and we must therefore seek guidance from Presiding Judge Keller's dissent in *Bigon*.[2] In it, she states the following:

> Although I authored *Landers,* the practical impossibility of determining in some cases which offense is really the most serious has convinced me that it would be preferable to simply give the local prosecutor the option to choose which conviction to retain. Making the matter a function of prosecutorial discretion seems to be most consistent with our prior recognition that a prosecutor in this type of situation is entitled to "submit both offenses to the jury for consideration" and receive "the benefit of the most serious punishment obtained." If a subjective decision is to be made, let the local prosecutor who exercised the decision to bring the case make

---

[2] We note that the Austin Court issued a post-*Cavazos* opinion that utilized parole and good time considerations as a tie-breaker when all other tie-breakers yield an equal result. *See Williams v. State,* 240 S.W.3d 293, 300 (Tex. App.—Austin 2007, pet. ref'd); *but see Ex parte Williams,* No. WR-69021-04, 2013 WL 5872880, at *1 (Tex. Crim. App. Oct. 30, 2013) (granting Williams the opportunity to file an out-of-time petition for discretionary review of the judgment of the Third Court of Appeals' decision).

We do not read *Cavazos* as expansively as the *Williams* Court and decline to extend its holding today. However, even if we were to utilize parole and good time considerations as a tie-breaker in this case, the three remaining convictions would nevertheless remain equal. Pursuant to government code section 508.145(d)(1), *see* TEX. GOV'T CODE ANN. § 508.145(d)(1) (West, Westlaw through 2013 C.S.), read in conjunction with article 42.12 of the code of criminal procedure, *see* TEX. CODE CRIM. PROC. ANN. art.42.12 § 3g(a)(1)(A), (I) (West, Westlaw through 2013 C.S.), Almaguer is not eligible for release on parole for any of the remaining three convictions for 30 calendar years.

12

it. Indeed, doing so would be consistent with at least one of our decisions—
*Ex parte Ervin,* [991 S.W.2d 804, 817 (Tex. Crim. App. 1999)] the very case
relied upon to find a double-jeopardy violation here.

*Bigon,* 252 S.W.3d at 374 (Keller, P.J., dissenting). Absent any authority to the contrary,
we adopted Presiding Judge Keller's suggestion and ordered this cause abated and the
issue remanded to the trial court for the local prosecutor's office to decide which
conviction should be retained as the "most serious." *See id.*

On May 27, 2014, pursuant to this Court's abatement order, the trial court held a
hearing to give the Hidalgo County District Attorney's office an opportunity to decide which
of the following remaining convictions (counts two, three, and four of trial court cause
number CR–217–09–B) was the most serious offense. Almaguer was not present at the
hearing, but was represented by counsel. The trial court found that Almaguer's presence
was not required and proceeded with the hearing. At the hearing, the State elected that
the charge of murder as alleged in count two of Almaguer's indictment to be the most
serious offense. The trial court accepted the State's election and recommended that this
Court retain Almaguer's conviction for murder and vacate the remaining two convictions
as a violation of the prohibition against double jeopardy.

We reinstated this appeal on June 13, 2014. After due consideration, we accept
the State's election that Almaguer's conviction for murder, as alleged in count two of her
indictment, is the most serious offense. *See id.* Accordingly, we vacate and set aside
Almaguer's convictions for intentionally or knowingly causing serious bodily injury to a
child by act (count three); and intentionally or knowingly causing serious bodily injury to
a child by omission (count four) because to retain them would violate Almaguer's
protection against double jeopardy. *See Ex parte Cavazos,* 203 S.W.3d at 337; *Landers,*

13

957 S.W.2d at 559-60. This therefore leaves Almaguer's conviction for murder, as alleged in count two, as the only judgment of conviction remaining.

Almaguer's second issue is overruled.

## IV. SUPPRESSION OF ALMAGUER'S JUNE 18, 2008 STATEMENT

By her third issue, Almaguer asserts that the trial court erred in denying her pre-trial motion to suppress her June 18, 2008 statement because it was obtained following an allegedly unlawful seizure of her in Mexico in violation of "treaties" between the United States and Mexico and the Fourth Amendment. *See* U.S. CONST. amend IV.

### A. Standard of Review

We review a trial court's denial of a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We give almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but apply a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011) (internal citations omitted).

When the trial court does not issue findings of fact, as here, findings that support the trial court's ruling are implied if the evidence, viewed in a light most favorable to the ruling, supports those findings. *Turrubiate*, 399 S.W.3d at 150 (citing *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006)). Almost total deference is given to the trial court's implied findings, especially those based on an evaluation of witness credibility and demeanor. *Id.* We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.*

14

**B. Discussion**

**1. Waiver**

As a preliminary matter, the State argues that Almaguer waived this issue on appeal because she offered her June 18, 2008 statement as Defense Exhibit 3 after it had already been offered by the State and admitted into evidence by the trial court. We are unpersuaded by the State's argument.

"As with error preservation in general, the rule that a later statement of 'no objection' will forfeit earlier-preserved error is context-dependent." *Thomas v. State*, 408 S.W.3d 877, 885 (Tex. Crim. App. 2013). In our review of error preservation, we do not focus exclusively on the statement itself, in isolation, but should consider it in the context of the entirety of the record. *Id.* In other words, if the record as a whole plainly demonstrates that the defendant did not intend, nor did the trial court construe, his "no objection" statement to constitute an abandonment of a claim of error that he had earlier preserved for appeal, then the appellate court should not regard the claim as "waived," but should resolve it on the merits. *Id.* However, if from the record as a whole we simply cannot tell whether an abandonment was intended or understood, then, consistent with prior case law, it should regard the "no objection" statement to be a waiver of the earlier-preserved error. *Id.*

In this case, Almaguer filed a pre-trial motion to suppress the June 18, 2008 statement, which the trial court denied. The suppression hearing took place over several months, with several witnesses testifying, including officers from the McAllen Police Department, a lay witness from Mexico, and an expert law professor from the University of Houston Law Center. Additionally, when the State offered Almaguer's June 18, 2008 statement at trial, Almaguer's counsel reiterated her pre-trial objections, which were

15

overruled. Based upon this record, we cannot conclude that Almaguer's offer of Defense Exhibit 3, after a lengthy suppression hearing and re-urging of her objections at trial, constituted an abandonment of her claim of error. *See id.* Accordingly, we will address the merits of Almaguer's third issue.

### 2. Analysis

Almaguer, a Mexican citizen who was unlawfully living in McAllen, alleged that she was involuntarily taken by Mexican authorities from the city of Miguel Aleman, Tamaulipas, Mexico, in the days following Ismael's death.[3] Almaguer was in Mexico visiting her friend Luis Cuatemoc Ramos. Almaguer asserts that her June 18, 2008 statement was taken as a result of an unlawful seizure in violation of international law and treaties, which would render her statement inadmissible.

Ramos, a Mexican national and Almaguer's friend from Miguel Aleman, testified that Almaguer arrived at his residence in June 2008 and that they both left in her vehicle to buy food. Ramos recalled that a policeman then stopped their vehicle, followed by about "four or five" other police vehicles. Ramos recalled that Mexican authorities transferred Almaguer to another vehicle and that they were looking for Almaguer because they had received information about her. Finally, Ramos testified that he observed another unidentified man take Almaguer away from local police.

McAllen Police Chief Victor Rodriguez testified that in June 2008, he received a call from former Starr County Sheriff Rey Guerra, who had information about Almaguer's whereabouts in Mexico. According to Chief Rodriguez, Sheriff Guerra put him in touch

---

[3] The record shows that the Mexican government hired outside legal counsel to be present at the inception of Almaguer's case. However, when the State elected not to seek the death penalty against Almaguer, the Mexican government's counsel no longer attended the proceedings.

with a "*Comandante* Lerma" in Mexico.[4] Chief Rodriguez testified that *Comandante* Lerma told him that the Mexican authorities had Almaguer in custody and were "ready to return her to the U.S." Chief Rodriguez testified that he advised *Comandante* Lerma to speak and coordinate Almaguer's return to the United States with the Federal Bureau of Investigation's (FBI) Liaison Special Agent Jorge Cisneros.[5] Chief Rodriguez stated that it is the McAllen Police Department's "practice and custom" to utilize the FBI's liaison officer in Mexico when a suspect is arrested in Mexico and the McAllen Police Department seeks that individual's return to the United States. Finally, Chief Rodriguez testified that once Almaguer's custody transfer was coordinated between the Mexican authorities and Special Agent Cisneros, Special Agent Cisneros traveled to Mexico and coordinated her release with McAllen police officers on the United States side of the Roma, Texas international port of entry.

In support of her motion to suppress, Almaguer elicited the testimony of University of Houston Law Center professor Jordan Paust at the pre-trial hearing as an expert on her rights under international law.[6] Based upon his review of this case, Professor Paust opined as follows through his affidavit that was admitted into evidence:

> Customary and treaty-based international law was violated in this case (assuming facts alleged and testified to) when a U.S. F.B.I. agent (1) took [Almaguer] into custody in Mexico, (2) handcuffed [Almaguer] in Mexico, (3) transferred [Almaguer], (4) with a gun, to and into the U.S. at an international bridge at the Roma port of entry without a request for or consent of the Government of Mexico to engage in any such law enforcement and sovereign conduct in Mexico.

---

[4] Chief Rodriguez could neither recall *Comandante* Lerma's first name nor the agency for which he worked in Mexico.

[5] The record indicates that attempts were made to subpoena Special Agent Cisneros to testify; however, Special Agent Cisneros did not testify at any time in the proceedings below.

[6] According to Professor Paust's curriculum vitae, he is the Mike and Teresa Baker Law Center Professor at the University of Houston Law Center who teaches international law and international criminal law at the University of Houston, as well as a published author on the subject of international law.

17

Furthermore, Professor Paust explained that Chief Rodriguez's actions of calling *Comandante* Lerma to "initiate the law enforcement process in Mexico" were as if he was "acting in Mexico . . . as if [he was] physically present there." According to Professor Paust, these actions violated the 1979 United States-Mexico Extradition Treaty (the "Extradition Treaty"). *See* Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059.

Therefore, in light of Almaguer's argument, our inquiry turns upon whether the United States violated the Extradition Treaty by seizing Almaguer in Mexico through Mexican law enforcement, who then effectively deported her to the United States. We conclude that it did not.

As Professor Paust noted, the United States Supreme Court held in *United States v. Alvarez-Machain*, 504 U.S. 655, 668–69 (1992), that to infer from the Extradition Treaty and its terms that it "prohibits all means of gaining the presence of an individual outside of its terms goes beyond established precedent and practice." *Id.* In *Alvarez-Machain*, respondent Humberto Alvarez-Machain, who was a citizen and resident of Mexico, was forcibly kidnapped from his office and flown by private plane to El Paso, Texas, where he was arrested by United States Drug Enforcement Agency (DEA) officials for his role in the murder of former DEA special agent Enrique Camarena. *See id.* at 657. Alvarez-Machain successfully convinced the district court to dismiss the charges brought against him for lack of jurisdiction because his abduction violated the Extradition Treaty. *See id.* at 658. The Court of Appeals for the Ninth Circuit upheld the dismissal and held that Alvarez-Machain's abduction violated the "purpose" of the Extradition Treaty. The United States Supreme Court reversed and remanded, after concluding that the particular

18

defendant's abduction was not in violation of the Extradition Treaty. *See id.* at 669 (citing *Ker v. Illinois*, 119 U.S. 436, 443–44 (1886) ("There are authorities of the highest respectability which hold that such forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court.")).

Although Alvarez-Machain sought different relief than Almaguer—i.e., dismissal of charges for want of jurisdiction versus suppression of alleged illegally obtained evidence —we find Almaguer's arguments similar to those advanced by Alvarez-Machain. We are unpersuaded by any arguments made by Almaguer to depart from the U.S. Supreme Court's precedent in *Alvarez-Machain* and conclude that Almaguer's purported abduction was not in violation of the Extradition Treaty.[7] *See id.* at 669. We overrule Almaguer's third issue.[8]

## V. ADMISSIBILITY OF PRIOR CONVICTIONS

By her fourth issue, Almaguer complains of the trial court's admission of evidence of her prior convictions. Almaguer argues that the trial court erred by admitting irrelevant

---

[7] Professor Paust's affidavit and testimony discuss two relevant post-*Alvarez-Machain* documents that support his argument. The first is entitled the "Memorandum of Understanding Between the Government of the United States of Mexico and the Government of the United States of America on Procedures for Cooperation Regarding Law Enforcement Activities" entered into in 1999, which Professor Paust argues "can operate like an Executive Agreement." However, neither Professor Paust's affidavit or testimony nor Almaguer's briefing cite any authority to support that the 1999 Memorandum of Understanding may be interpreted as an authoritative source as it relates to this issue on appeal.

The second document is entitled "The 2001 Agreement" between former U.S. President George W. Bush and former Mexican President Vicente Fox. Professor Paust and Almaguer argue that it "has the force and effect of an Executive Agreement under international law in view of the fact that it is constituted by formal exchange of letters by the Presidents of each country and creates a 'commitment. . . .'" Again, however, the briefs do not cite, nor do we find any authority supporting such an argument, and the record does not contain these purported letters exchanged between the two presidents.

Accordingly, we find both arguments inadequately briefed for our review. *See* TEX. R. APP. 38.1(i).

[8] We express no opinion about whether Almaguer is without remedy against those individuals whom she alleges seized her without authority in Mexico. *See generally Ker v. Illinois*, 119 U.S. 436, 444 (1886).

19

character conformity evidence, see TEX. R. EVID. 401; 404(b), or, if relevant, the testimony's probative value was substantially outweighed by the danger of unfair prejudice. See TEX. R. EVID. 403.

## A. Standard of Review and Applicable Law

### 1. Rule 404(b)

We review a trial court's decision to admit or exclude evidence over a rule 404(b) objection for an abuse of discretion. See Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (en banc). Stated another way, we will not disturb a trial court's ruling if it was "at least within the zone of reasonable disagreement." Id.

When a party attempts to adduce evidence of "other crimes, wrongs or acts," in order to preserve error on appeal, the opponent of that evidence must object under rule 404(b) in a timely fashion. Montgomery, 810 S.W.2d at 387. Once a complaint is lodged, it is incumbent upon the proponent of the evidence to satisfy the trial court that the "other crime, wrong, or act" has relevance apart from its tendency "to prove character of a person in order to show that he acted in conformity therewith." Id. (citing TEX. R. EVID. 404(b)). If the trial court determines the evidence has no relevance apart from character conformity, then the evidence is absolutely inadmissible, and the trial court has no discretion to admit it. Id. However, the proponent of the evidence may persuade the trial court that the "other crime, wrong, or act" has relevance apart from character conformity—i.e., that it tends to establish some elemental fact, such as identity or intent; that it tends to establish some evidentiary fact, such as motive, opportunity or preparation, leading inferentially to an elemental fact; or that it rebuts a defensive theory by showing, e.g., absence of mistake or accident. TEX. R. EVID. 404(b); Montgomery, 810 S.W.2d at 387–88. Only if we can say with confidence that "by no reasonable perception of common

20

experience can it be concluded that proffered evidence has a tendency to make the existence of a fact of consequence more or less probable than it would otherwise be, then it can be said the trial court abused its discretion to admit that evidence. *Id.* at 391 Moreover, when it is clear to the appellate court that what was perceived by the trial court as common experience is really no more than the operation of a common prejudice, not borne out in reason, the trial court has abused its discretion. *Id.* If we find error, in our review, we evaluate the error for harm—that is, whether the error affected the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b).

## 2. Rule 403

We likewise measure the trial court's ruling to admit or exclude evidence under rule 403 for an abuse of discretion. *See Montgomery*, 810 S.W.2d at 391. Similar to rulings under rule 404(b), we will not reverse a trial court's ruling if it was within the zone of reasonable disagreement. *See Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (en banc).

Once an objection is made under rule 403, the trial court is called upon to weigh probativeness of the evidence against its potential for "unfair" prejudice—that is, "its tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Montgomery*, 810 S.W.2d at 389 (internal quotations and citations omitted). Rule 403 imposes a duty upon the trial court to inquire from the opponent about the purported prejudice from the admission of the evidence. *Id.* Likewise, the trial court should ask the proponent to articulate his need. *Id.* Once rule 403 is invoked, however, the trial court must engage in a balancing test. *Id.* Finally, the language of rule 403 that evidence "*may* be excluded if its probative value is substantially outweighed by the danger of unfair prejudice," TEX. R. EVID. 403 (emphasis added),

21

simply means that trial courts should favor admission in close cases, in keeping with the presumption of admissibility of relevant evidence. *Montgomery*, 810 S.W.2d at 389.

## B.    Discussion

Almaguer complains about the admissibility of certain testimony from McAllen Police Investigator Lopez. Specifically, Almaguer objected under rule 404(b) and rule 403 to testimony regarding Investigator Lopez's attempts to locate Almaguer at her residence following Ismael's death and his subsequent discovery of a business card left by Almaguer's parole officer regarding an upcoming appointment. The trial court held a hearing outside the jury's presence and overruled Almaguer's objections. The following testimony at trial is at issue:

| [STATE]: | We took a break, I think you said that you had gone back to the defendant's residence, 1812 North 4th Street, at a time after having met with her family at the funeral home? |
| --- | --- |
| [INVESTIGATOR LOPEZ]: | Yes, sir. |
| [STATE]: | To locate her again, and that while there, you came across a business card that had been left for Ms. Almaguer? |
| [INVESTIGATOR LOPEZ]: | Yes. |
| [DEFENSE COUNSEL]: | We reiterate all of our objections and may we incorporate all arguments previously made and ask for a ruling on all objections. |
| THE COURT: | Objections have been noted by the court and heard by the court and overruled. |
| [DEFENSE COUNSEL]: | Thank you, Your Honor. |
| [STATE]: | Can you tell the jury what kind of card had been left for Ms. Almaguer? |

22

[INVESTIGATOR LOPEZ]: It was a card from her parole officer advising them of a scheduled appointment for the next day, to be on Tuesday.

[STATE]: Did you attempt to contact the parole officer?

[INVESTIGATOR LOPEZ]: Yes, I did.

[STATE]: And did you gather further information from the parole officer in an attempt to locate the defendant?

[INVESTIGATOR LOPEZ]: Yes, I did.

Investigator Lopez later testified that after meeting with Almaguer's parole officer, he did not locate Almaguer, obtained a warrant for her arrest, and broadcast to police a "be on the lookout" (BOLO) notice for Almaguer. Almaguer argues that the trial court abused its discretion by allowing into evidence this portion of Investigator Lopez's testimony over her objections. We disagree.

As the proponent of Investigator Lopez's testimony, it was incumbent upon the State to satisfy to the trial court that the "other crime, wrong, or act" had relevance apart from its tendency "to prove character of a person in order to show that she acted in conformity therewith." TEX. R. EVID. 404(b); *Montgomery*, 810 S.W.2d at 387. During the hearing outside the presence of the jury, the State argued that the evidence had relevance to exhibit Almaguer's consciousness of guilt; that is, the reason for going to Mexico was "so important that she was going to miss a parole [appointment]." "Criminal acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible under Rule 404(b) as showing 'consciousness of guilt.'" *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1994); *see Johnson v. State*, 263 S.W.3d 405, 426 (Tex. App.—Waco 2008, pet. ref'd). Therefore, we conclude that evidence of Almaguer's parole appointment, and Investigator Lopez's follow up with her

23

parole officer had relevance apart from its tendency to prove character conformity—that is, the motive for her departure to Mexico shortly after Ismael's death and funeral. *See Montgomery*, 810 S.W.2d at 391; *see also Ransom*, 920 S.W.2d at 299.

Finally, Almaguer argues that even if such testimony was relevant, its probative value was substantially outweighed by its unfair prejudice. *See* TEX. R. EVID. 403. We, again, disagree. Once a rule 403 objection is made, the trial court is called upon to conduct a balancing test by considering several factors such as: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *See Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004) (citing *Montgomery*, 810 S.W.2d at 389–90). Courts have held that the probative value of a crime showing consciousness of guilt may outweigh its prejudicial impact. *See Ransom*, 920 S.W.2d at 299. The record shows that the trial court heard both the State's and Almaguer's arguments in favor and against its admission, recognized that it was a close call,[9] and ultimately favored admission, keeping with the presumption of admissibility of relevant evidence. *See Montgomery*, 810 S.W.2d at 389. Accordingly, we conclude that the trial court's ruling under Almaguer's rule 403 objection was within the zone of

---

[9] Prior to overruling Almaguer's rule 403 objection, the trial court made the following observation:

Well, I agree there is sufficient evidence to find that she was not at the funeral and was evidently not where she could be interrogated with respect to the results of the autopsy or anything else.

And the State insists on going forward with this. I don't know that it's necessary, but that's the State's prerogative to pursue this.

I'm going to overrule the objections and allow it.

reasonable disagreement and not an abuse of discretion. *See id.* at 391. Almaguer's fourth issue is overruled.

## VI. OUT-OF-COURT DRAWINGS AND STATEMENTS

By her fifth and final issue, Almaguer contends that the trial court reversibly erred by admitting "out-of-court statements/writings and drawings" made by Almaguer's son, "Marco," in violation of Confrontation Clause of the Sixth Amendment to the United States Constitution. *See* U.S. CONST. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 406 (1965).[10]

### A.    Standard of Review and Applicable Law

The Confrontation Clause guarantees the right of an accused "to be confronted with the witnesses against him." *Shelby v. State*, 819 S.W.2d 544, 546 (Tex. Crim. App. 1991) (en banc). This right of confrontation is a fundamental right and is applicable to the states by virtue of the Fourteenth Amendment. *Id.* (citing *Pointer*, 380 U.S. at 403). The primary interest protected under the Confrontation Clause is the right of cross-examination. *See Shelby*, 819 S.W.2d at 546 (citing *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). Therefore, a testimonial hearsay statement may be admitted by the trial court in evidence against a defendant—consistent with the Confrontation Clause guarantee—"only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.'" *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008) (quoting *Crawford v. Washington*, 541 U.S. 36, 59 (2004)).

Under this framework, the primary focus in determining whether a hearsay statement is "testimonial" is based upon the objective purpose of the interview or interrogation, not upon the declarant's expectations. *See De La Paz*, 273 S.W.3d at 680.

---

[10] We note that Almaguer's briefing solely argues the issue of whether the admission of the statements and drawings constituted a Confrontation-Clause violation. Accordingly, we will only address the merits of the Confrontation Clause argument in this opinion. *See* TEX. R. APP. P. 47.1.

25

"Testimony" has been defined typically as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51 (noting the distinction that an accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not). A variety of testimonial statements have been recognized as testimonial by the U.S. Supreme Court including: *ex parte* in-court testimony or functional equivalents such as affidavits, custodial statements, prior examinations where the defendant was unable to cross-examine, or similar pre-trial statements that declarants would reasonably expect to be used prosecutorially. *Id.*

Extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions and statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial have also been recognized as "testimonial" statements for purposes of the Confrontation Clause. *Id.* at 52. Furthermore, the U.S. Supreme Court noted in *Davis v. Washington* that most cases that apply the Confrontation Clause involved formal statements, such as sworn testimony in a prior judicial proceeding or formal depositions under oath. 547 U.S. 813, 825 (2006). However, English cases "that were the progenitors of the Confrontation Clause" did not limit exclusion to prior court testimony or formal depositions.[11] *Id.* The determination of whether a statement is testimonial is a question of law that we review de novo. *Wall v.*

---

[11] The U.S. Supreme Court noted that the Confrontation-Clause case law "invites the argument that the scope of the Clause is limited to that very formal category." *Davis v. Washington*, 547 U.S. 813, 826 (2006).

26

*State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006). If the trial court constitutionally erred, we must then evaluate for harm under Texas Rule of Appellate Procedure 44.2(a).

## B.    Discussion

### 1. Determination of Error

Almaguer's argument centers on a statement and three drawings/writings, admitted as State's Exhibits 146, 147, and 148, made by Almaguer's son, Marco, during a "grieve session" at the Child Advocacy Center in Edinburg, Texas on June 17, 2008, shortly after Ismael's death.

The State elicited testimony from former CPS investigator Jessica Fuentes that she was the first person to tell Almaguer's other children that Ismael had died.[12] Fuentes testified that after she told the children about the death, Marco stated, "[m]y mom did it." Fuentes further testified that Marco's sister, Julisa, told Marco "[s]hut up, it's not true." Fuentes stated that she then separated the children into different rooms to "grieve or go through the motion of what [she] just told them."

Fuentes testified that she visited Marco's room and spoke to him, and she described the initial conversation as follows:

| | |
|---|---|
| [FUENTES]: | [Marco] stated that he—his mom did it. That he walked into the home, coming inside to use the rest room, saw his mother walking with [Ismael] into the master bedroom and she closed the door, but the door did not close completely, and he saw his mom through the crack of the door where the hinges are and saw her stomp on [Ismael] twice. |
| [STATE]: | Now, were those the exact words that he used or is that what you understood him to mean? |

---

[12] At the time of Ismael's death, Almaguer had four other children: (1) Julisa, age 10; (2) Marco, age 8; (3) Jacqueline, age 7; and (4) Issac, age 4. Almaguer also gave birth to another child prior to her trial while incarcerated.

[FUENTES]: I understood him to say that. He may not have used the word "hinges," but he pointed at a door that was there.

[STATE]: Do you recall the words that he used?

[FUENTES]: Words that I recall from him is that he saw his mom stomp on him, on [Ismael], twice.

[STATE] Now, what name or what did Marco call his mother?

[FUENTES]: He also called her Elsa.

. . . .

[STATE]: What did you do when you heard this?

[FUENTES]: I told him I would be right back. I walked out in the hallway to speak to my supervisor and to notify law enforcement.

[STATE]: Before you walked out, you said you told him you'd be right back?

[FUENTES]: I told him I will be right back. There was a poster-size paper and markers in the room, as it is also used for other children to be interviewed or to play with while waiting in that facility. And I gave him permission to use the markers and the paper.

. . . .

[STATE]: Did he tell you anything else that he had seen his mother do after that?

[FUENTES]: He stated that she walked, opened the door, the bedroom door, and looked around to see if anybody had seen her.

[STATE]: Then you left him in the room and told him he could use the paper and the markers and walked out?

[FUENTES]: Yes.

Fuentes testified that she waited for a police investigator to arrive at the Child Advocacy Center to interview the children before she re-entered Marco's room. Fuentes stated that at that point, Marco provided her with "three different pictures that he had drawn" for her. Fuentes testified that no one requested or directed Marco to draw. Marco's drawings were admitted as State's Exhibits 146, 147, and 148 over Almaguer's hearsay and Confrontation Clause objections.

A lengthy hearing was held on these objections outside of the jury's presence. The trial court concluded that Marco's statements and drawings were excited utterances, an exception to the hearsay rule, see TEX. R. EVID. 803(2), "[g]iven the nature of this case and the fact that [Marco] had just lost his little brother." Our review of State's Exhibits 146, 147, and 148 show writings in Spanish that are translated as "My mom is mad with [Ismael] . . . because he doesn't walk or doesn't want to eat." The drawing also illustrates Almaguer, Ismael, a door, and Marco standing behind the door, which is consistent with the earlier story that Marco had recounted to Fuentes.

Our first inquiry is whether the statements and drawings are testimonial hearsay by looking upon the objective purpose of the interview or interrogation, not upon the declarant's expectations. See De La Paz, 273 S.W.3d at 680 (citing Davis, 547 U.S. at 822–23). Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. See TEX. R. EVID. 801(d). "Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. (citing Davis, 547 U.S. at 822–23).

Here, the State used Fuentes to sponsor statements and drawings made by Marco to prove that Almaguer stomped on Ismael. These statements and drawings are unquestionably hearsay. *See* TEX. R. EVID. 801(d). However, we conclude that these hearsay statements were not inadmissible because they fell under the excited utterance exception. *See* TEX. R. EVID. 803(2). An "excited utterance," defined as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," is not excluded by the hearsay rule, even if the declarant is available as witness. *See* TEX. R. EVID. 803(2). In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed and whether the statement was in response to a question. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). Stated another way, "a reviewing court must determine whether the statement was made 'under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection.'" *Id.* at 596 (quoting *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964)). Here, Marco made the disputed statements and drawings immediately or shortly after being told that his baby brother was dead. In other words, the record reasonably shows that these statements and drawings were made by Marco out of impulse rather than through reason or reflection. *See id.* Accordingly, we conclude that the guarantees of the Confrontation Clause were not violated by the admission statements and drawings at issue.

### a. Harmless Error Analysis

However, assuming *arguendo* that the excited utterance exception did not apply and that these statements and drawings were testimonial hearsay, we would conclude that any Confrontation Clause error in this specific case was harmless.

30

If the record in a criminal case reveals constitutional error, reversal of a judgment of conviction or punishment is required unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a). The court of criminal appeals identified several relevant factors for appellate courts to examine when determining whether constitutional error under *Crawford* may be declared harmless beyond a reasonable doubt, namely: (1) how important was the out-of-court statement to the State's case; (2) whether the out-of-court statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and (4) the overall strength of the prosecution's case. *Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010). The court of criminal appeals also provided the following additional guidance for appellate courts to consider when undertaking this type of analysis:

> In reaching [its] decision, the reviewing court may also consider, in addition to the factors listed above, *inter alia,* the source and nature of the error, to what extent, if any, it was emphasized by the State, and how weighty the jury may have found the erroneously admitted evidence to be compared to the balance of the evidence with respect to the element or defensive issue to which it is relevant. With these considerations in mind, the reviewing court must ask itself whether there is a reasonable possibility that the *Crawford* error moved the jury from a state of non-persuasion to one of persuasion on a particular issue. Ultimately, after considering these various factors, the reviewing court must be able to declare itself satisfied, to a level of confidence beyond a reasonable doubt, that the error did not contribute to the conviction before it can affirm it.

*Id.* (quoting *Scott v. State*, 227 S.W.3d 670, 690–91 (Tex. Crim. App. 2007)).

The out-of-court statements and drawings at issue were arguably important to the State's case because it provided the State with a direct eyewitness to Almaguer's role or participation in Ismael's death. However, earlier in the trial, the jury received evidence of Almaguer's own admission to police through her June 18, 2008 statement, where she

31

stated that she "remember[ed] hitting [Ismael] with [her] right foot on his stomach" before his death.

Furthermore, probably the most important consideration is that the record shows that Almaguer called Marco as a witness during her case-in-chief. During his testimony, Marco denied drawing any of State's Exhibit 146, 147, or 148 four years prior. More specifically, he classified the assertion that he did as a "lie." Instead, Marco recalled that an unknown man at the Child Advocacy Center "told" him to make the drawings and then took the drawings away from him when they were complete. Marco further testified that Almaguer had spanked Ismael before his death, but that she never hit him in the stomach. Finally, Marco testified that he did not know that Ismael had died until after he drew the pictures. Marco's testimony contradicted almost entirely everything put forth by the State on this issue. Put simply, Marco's testimony likely dissolved any reasonable possibility that the purported *Crawford* error, if any, moved the jury from a state of non-persuasion to one of persuasion on a particular issue.

The out-of-court statements and drawings arguably strengthened the State's case, but even without these statements and drawings, the State's case was strong in light of Almaguer's June 18, 2008 statement of "hitting" Ismael in the stomach, which was inconsistent with Almaguer's prior statement to police about Ismael's injuries. Additionally, this June 18, 2008 statement corroborates Dr. Farley's testimony that Ismael died as a result of blunt force abdominal trauma caused by a punch or a kick. Finally, the State also presented evidence of Almaguer's flight to Mexico immediately following Ismael's death, which can be taken as consciousness of guilt. *See, e.g., Clay v. State*, 240 S.W.3d 895, 905, n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt.") (internal citations omitted).

32

Accordingly, taking the record as a whole and assuming without deciding that *Crawford* error exists, we are persuaded beyond a reasonable doubt that the jury's verdicts in this case would have been the same even if the trial court had not admitted Marco's out-of-court statements and drawings. Almaguer's final issue is overruled.

## VII. CONCLUSION

We vacate and set aside Almaguer's convictions for manslaughter under count one, injury to a child by act under count three, and injury to a child by omission under count four. We affirm the remaining judgment of conviction for murder as alleged in count two of the indictment.

GINA M. BENAVIDES,
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of October, 2014.

33