

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00020-CR

MARKERRION D'SHON ALLISON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 46571-B

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss
Concurring Opinion by Justice Burgess
Dissenting Opinion by Justice Stevens

# MEMORANDUM OPINION

Following a jury trial, Markerrion D'Shon Allison was convicted of aggravated robbery and sentenced to twenty-five years' confinement in prison. On appeal, Allison claims that the State presented insufficient evidence to corroborate his co-defendant's testimony, the trial court erred when it admitted evidence of an extraneous offense, and the trial court erred when it admitted an expert opinion because it violated evidentiary rules and his constitutional right to confront adverse witnesses. Although (1) sufficient evidence corroborated the co-defendant's testimony, we conclude that (2) admitting testimony on the meaning of "pull a Carlos" was harmful constitutional error. Therefore, we reverse the judgment of the trial court and remand for a new trial.

This case stems from an aggravated robbery that was alleged to have occurred on September 8, 2016. There were four suspects involved in the robbery, Allison, R.J.,[1] Sean Owens-Toombs, and Trekeymian Allison (T.K.).[2] On January 6, 2017, R.J., Owens-Toombs, and T.K. were arrested for committing the September 8 aggravated robbery, and an arrest warrant was also issued for Allison. Of particular interest in this case is a telephone call that occurred between Allison and T.K. on January 7, 2017, while T.K. was in jail on the aggravated robbery charge. The next day, on January 8, 2017, a second shooting took place outside the home where the September 8 aggravated robbery had occurred. A few weeks later, Allison was

---

[1]In this opinion, we refer to minors by initials to protect their identities. *See* TEX. R. APP. P. 9.8, 9.10.

[2]T.K. is Allison's cousin.

arrested for the September 8 aggravated robbery. There were never any arrests for the January 8 shooting. Allison was ultimately convicted of the September 8 aggravated robbery and was sentenced to twenty-five years' incarceration. *See* TEX. PENAL CODE ANN. § 29.03. Allison's appeal involves the following facts.

***The Events of September 8, 2016.*** On the evening of September 8, Jose Jimenez was shot in the head and rendered unconscious but later woke up in a pool of his own blood. At trial, Jimenez testified that he had lived in Longview at a house located on Clearwood Drive (the Clearwood house) for about four months before moving back into his parents' home. Jimenez said that, after he moved out of the Clearwood house, he "still hung out at the house[.]" According to Jimenez, Caleb Krug, Justin Anderson, and Rebekah Prater lived in the Clearwood house when the alleged incident occurred. Jimenez also explained that William Benicaso eventually moved into the house, but he did not pay rent. According to Jimenez, Benicaso would sell "weed here and there, hustl[e] people, kind of just do[] odd jobs to get money, [and] do what he could to get it."

On the afternoon of September 8, after leaving work sometime between 12:00 and 2:00 o'clock in the afternoon, Jimenez went to the Clearwood house to hang out and watch YouTube. When he arrived at the house, Anderson, Benicaso, and Prater were there. After about an hour, they left, leaving Jimenez alone at the house, smoking and playing video games. Around that time, Jimenez heard a knock on the door. He cracked open the door, stuck his head out, and saw a young, black male that was a "little heavier set" and who asked Jimenez if Benicaso was at

3

home. Jimenez immediately thought that the person was there to buy marihuana, so Jimenez told him nobody else was in the house and that there was no marihuana in the house either. According to Jimenez, the individual was looking down at his telephone and texting the entire time.

Jimenez recalled describing the individual to the police officer as male, around seventeen or eighteen years old, black, around Jimenez's height, or maybe a bit shorter.[3] Jimenez continued, "He's a little heavier set, not overweight, but . . . he had a little bit of chunk to him, dressed in . . . khaki shorts, like somewhat striped shirt, kind of a shaved side head, a flat top kind of haircut, [with] glasses." Jimenez also said that the individual had "a little bit of chin hair, but not like I do, not quite a bit." Jimenez stated that he was shown a photographic lineup to identify the individual, but he was unable to identify the person.

Later that evening, and while still at the Clearwood house, Jimenez heard another knock at the door. Jimenez explained that he was still alone and that he had continued smoking marihuana and drinking beer. Jimenez said, "I had a really funny feeling as if something bad was going to happen." As he opened the door, he saw the end of a shotgun barrel. Jimenez tried to close the door, but the individuals pushed their way inside. One of the individuals circled Jimenez and then hit him on the back of the head with a pistol, asking where "it" was. Jimenez said he told them that "there wasn't anything." He said he did not know exactly what they wanted, but he "figured it was money or drugs." Jimenez was pushed to the ground, while the

---

[3]Jimenez said he was about five feet, eight and one-half inches tall.

4

intruders began "rummaging" through the house, continually asking Jimenez "where it [was]." At that point, someone picked Jimenez up by his hair, shoved him into Anderson's bedroom, and forced him to flip over Anderson's bed. They then sent Jimenez back to the living room and ordered him to "kneel down once again." Jimenez testified, "[T]hey started saying . . . go get T.K. . . . I want to kill this fool." Jimenez explained,

> I remember -- I don't know who it was, but someone had pointed a laser site that was on a gun, you could kind of tell. Kind of left it towards my vision to where I could see it and slowly drug it over.

> I could feel where it was touching the back of my head. Even [though] they don't emit heat, I could almost feel where it was, and after that, I just kind of woke up on the carpet. The front door was open. I was in a pool of my own blood.

Seeing that the individuals had left, Jimenez "shambled" over to the door, then closed and locked it. He tried to send a text message to Benicaso but was unable to type anything but a string of letters. Almost immediately, he heard his cell phone ring. Jimenez managed to answer the phone and heard Benicaso asking him if everything was all right. The next thing he could remember was Benicaso "busting in." At that point, Jimenez said that he blacked out, and when he woke up, he was in the hospital emergency room.[4] Jimenez testified that he did not call 9-1-1 because he knew Benicaso's "history" and did not want to get him in trouble.

---

[4]Jimenez said that being shot caused him to lose some of his eyesight, fractured his skull, left skull fragments lodged in his brain, shifted his brain two or three centimeters to the left, and caused him to "los[e] some gray matter," which was also found at the crime scene.

As to the intruders' descriptions, Jimenez said that one of the individuals wore a neoprene mask. That person was black, dark-skinned, "lanky,"[5] and around five-eight, one-half inches; he had been wearing dark clothing. According to Jimenez, he was no older than twenty-two years old.[6] The State alleged that this individual was Allison. Yet, when Jimenez was asked to pick Allison out of a lineup, he was unable do so.

Jimenez also described one of the individuals as younger than the others,[7] lighter-skinned, Cuban-looking, about five feet, ten inches tall, with a thin mustache, short hair, and possibly a tattoo on his neck. According to Jimenez, this person was skinny but had muscles, and was at least two inches taller than he was. Jimenez said he believed this person was the individual carrying the gun that had a laser on it. Following the incident, Jimenez identified this person as Owens-Toombs.

The third individual, according to Jimenez, was a black male that was heavier set, was about six feet tall, and had a mustache and some chin hair, along with a "very angry look." Jimenez stated that this person was wearing a red sports jersey, with white writing on it—something like a basketball jersey, but with sleeves. This was the first person he saw, recalling that it was "almost like looking into the face of a wild animal and seeing nothing but just kind of

---

[5]At the hospital, Jimenez described the person as being "scrawny," which to him meant the same thing as "lanky."

[6]Jimenez was not sure if he was carrying a weapon.

[7]Jimenez estimated this person to be around eighteen or nineteen years old.

rage and hatred." According to Jimenez, this person was holding a shotgun. Following the incident, Jimenez identified the individual in a photographic lineup as being T.K.[8]

Anderson testified that, earlier the same day, he and Benicaso had an encounter with three individuals at the Clearwood house. Anderson explained that he heard someone beating on the door of the house, so he, along with Benicaso, stepped outside and saw three young individuals. After making introductions and shaking hands, one of the individuals asked if they could buy some marihuana. Anderson said, "We told them we didn't have any." According to Anderson, one of the individuals then asked them if they wanted to buy some marihuana, to which they responded that they did not. At that point, the individuals asked Anderson and Benicaso if they wanted to buy any handguns. They also offered to sell Anderson and Benicaso "other drugs." Anderson clarified that the individuals "were talking to [Benicaso] at that point in time. [Anderson] was just standing outside around the side of [his] truck right then." After the brief conversation ended, the individuals walked back down the street. Anderson said that he had never seen the individuals before that day.

Anderson said the group was made up of two African-American males and another male who looked "mixed or Hispanic." According to Anderson, they were all younger than he was, with their ages ranging from seventeen to twenty. Anderson testified that one of the black individuals was about six feet tall and was "a little bit thicker than the other two." Anderson said

---

[8]Jimenez testified that he thought there might have been a fourth person in the house "walking around in the background when two of them were in the living room with [him]." He clarified that the incident happened so quickly, it could have been one of the other individuals. On cross-examination, Jimenez said that he was ninety percent sure there were four people in the house.

7

that the other black male "was a little bit skinnier," had dark hair, and was about Anderson's height, which was about five feet, nine inches. Lastly, the Hispanic-looking male had black hair, and Anderson thought he was wearing shorts and a "greenish" t-shirt.

R.J.[9] testified that he, along with Allison, Owens-Toombs, and T.K., participated in the robbery the evening of September 8. R.J. said that, when he spent time with T.K. and Owens-Toombs, they would "smoke" and "chill." R.J. said that he had been to the Clearwood house on a prior occasion to buy marihuana and "smoke[] with this dude name[d] [Benicaso] that stayed there, and [R.J.] smoked over there with [Benicaso] maybe once or twice maybe." R.J. stated that Benicaso sold "pretty good weed" at "a good price."

According to R.J., that afternoon, he walked to T.K.'s house to "chill" with Owens-Toombs, T.K., and Allison, along with some other people whom he did not know. T.K.'s house was located only a few blocks away from the Clearwood house. Sometime around six o'clock, R.J. decided to go to the Clearwood house to buy some marihuana from Benicaso, but when he arrived, he learned through Jimenez that Benicaso was not home. R.J. asked Jimenez to tell Benicaso that T.K. had come by the house, and then he walked away, heading back to T.K.'s house. When he arrived back at the house, Owens-Toombs, T.K., and Allison were still there.

R.J. said that, after he informed the group that Benicaso was not home, they decided to go back to the Clearwood house to search the house for marihuana. R.J. explained, "[W]e [were]

---

[9]Although the State called Owens-Toombs and T.K., they refused to testify.

thinking that he's left all his weed there. You see what I'm saying?" So, with that in mind, the group gathered their guns[10] and drove back to the Clearwood house sometime after dark.[11]

When they arrived at the Clearwood house, everyone but R.J. got out of the car. According to R.J., Allison was wearing a mask. R.J. stated, "[T]hat's how I knew it was him." R.J. said that none of the others were wearing a mask.[12] R.J. did not recall what kind of material the mask was, but he said he could see Allison's mouth and eyes. R.J. took his shoes and socks off, then put his socks back on his hands because he "knew [they] were going to be looking for stuff, and [he] didn't want to touch nothing." R.J. said that, by the time he got to the door, it was open, and the others had gone inside. When R.J. entered the house, the first thing he saw was Allison searching the living room, which was at the front of the house. R.J. also saw blood on the floor in the middle of the living room. R.J. said he went to look in the bathroom, which was also in the front of the house, and began searching for the marihuana. According to R.J., he could hear people yelling "back and forth" in one of the back rooms. While the arguing continued, R.J. went into the living room and continued his search. R.J. said that, by that time, Allison had gone "deeper in the house."

R.J. testified that he never saw Jimenez during the time he was inside the house, which was, in his opinion, about five to seven minutes. R.J. explained that, after he finished searching

---

[10]R.J. said that T.K. was carrying a shotgun, Owens-Toombs was carrying a handgun with a laser on it, and Allison also had a small handgun.

[11]R.J. said that they parked the car in the middle of the street, but not close to the house.

[12]At trial, R.J. identified Allison as the defendant.

9

the living room, he ran out the front door and began running down the street toward T.K.'s house. According to R.J., the only person he saw behind him was Allison. R.J. said he did not look back again because he heard one or two gunshots. After arriving at T.K.'s house, R.J. said that he went outside to the porch to get his phone and saw that Allison had made it back to T.K.'s and the others were "running up already." R.J. stated that, at that time, Allison did not have his mask on, and R.J. did not know where the mask was. According to R.J., they never spoke about the incident again.[13] R.J. also described Owens-Toombs as being light skinned, T.K. as being tall, and Allison as being short.

***Allison's Jailhouse Telephone Conversation with T.K. on January 7, 2017.*** The jury heard a recording of a jailhouse telephone call that took place between Allison and T.K. on January 7, 2017, just a day before someone shot through the window of the Clearwood house. T.K. began the call by asking Allison, "Hey. . . . What's on the street?" Allison responded, "Everybody thinking, 'Oh, shot a n****r in the head or (inaudible).'" Allison then referred to his mother telling him, "[Inaudible] said they came to her house looking for me early this morning." T.K. asked, "For what?" Allison responded, "You know. For that s**t." After a brief exchange, T.K. said, "I need you to pull a Carlos," to which Allison asked, "Yeah?" T.K. answered in the affirmative. After another brief exchange, T.K. said, "We all's in there together." Allison agreed. T.K. then asked, "Why [did R.J.] turn himself in?" Allison then made a reference to Jimenez, to which T.K. responded, "They said three people hit the backyard

---

[13]R.J. did testify, however, that, in exchange for his testimony at trial, he received a sentence of ten years' deferred adjudication community supervision.

10

and stole some s**t.  Then he said something about four people jumping in there over the fence. . . .”  T.K. then told Allison, “I’m trying to figure out where they got our name from, for real.”  Allison answered, “I dunno.  This is bulls**t.”  After another brief exchange between the two, T.K. said, “Well, yeah, I need you to do a Carlos.”  Allison said, “Yeah, I’ll, I’ll --.”  T.K. then said, “Mm-hmm (affirmative) Cuh - Then I’ll talk to - ”

The pair next discussed “how everybody else[’s] name got into it.”  Allison responded, “That what I say.  I dunno.  I don’t know how . . . they got my name, he – Anthony name too.  You know there’s some crazy [stuff].”  After a few more comments between them, T.K. said, “Well . . . I’m fixing to go see . . . lay down, see.  Do that . . . Probably need you to do that Carlos for me, put that money on the books.”  After Allison said he was “over at a dude’s house for like three days [inaudible,]” T.K. said, “Yeah.  We need to go on get that out the way, though.”  The pair continued exchanging comments when Allison said, “[Inaudible] I know this [stuff] ain’t adding up.”  T.K. responded, “Yes, it is adding up.”  Allison did not understand T.K.’s comment, so T.K. repeated, “I said, ‘It is adding up.’”  T.K. continued, “These n****rs done got our, done got our names in some bulls**t.”  Allison questioned what T.K. had just said, when T.K. told Allison, “That why n****rs you d-get that out the way.”  Right before ending the telephone call, T.K. again said, “Go on and pull that Carlos, though,” to which Allison responded, “Uh huh.”  T.K. then ended the call by telling Allison “All right.  Bye.  Be careful, boy.”  Allison answered, “That’s a bet.”

11

***The January 8, 2017, Shooting at the Clearwood House.***[14]  The following day, Prater and a friend, Thomas, returned to the Clearwood house around one o'clock in the morning after making a trip to the gas station.  When they arrived, they saw two male individuals wearing ski masks at the front door of the house and another male individual hiding behind a car in the driveway.  Prater also said there was a fourth male individual inside the carport at the garage door who was wearing a jacket with an attached hood.  According to Prater, the individuals allowed her to go inside the house.  Prater then locked the door and informed everybody in the house that the individuals were just outside.  The next thing Prater remembered was hearing gunshots.  She said that nobody in the house was injured, but there was a hole in the front window of Anderson's bedroom.

---

[14]Before addressing the January 8 incident, Allison objected to the testimony as violating Rules 401, 403, and 404 of the Texas Rules of Evidence, as well as his right to confront witnesses against him.  The trial court overruled the objections, and Allison asked for a running objection and a limiting instruction.  The trial court granted his request for a running objection and stated that it would provide an appropriate instruction in its jury charge.  Even so, after excusing the jury and hearing arguments of counsel, the trial court orally gave the requested instruction.  The trial court instructed the jury,

> During the trial, you have heard or you're about to hear evidence that the Defendant may have committed an extraneous offense not charged in the indictment.
> The State offered the evidence to show -- or is offering the evidence to show that the Defendant's -- to show the Defendant's consciousness of guilt, motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.
> You are not to consider this evidence at all unless you find beyond a reasonable doubt that the defendant did, in fact, commit the extraneous offense.  Even if you do find that the Defendant committed the extraneous offense, you may consider this evidence only for the limited purpose I have described.
> You may not consider this evidence to prove that the Defendant is a bad person and for this reason was likely to have committed the charged offense.
> In other words, you should consider this evidence only for the specific limited purpose I have described.  To consider this evidence for any other purpose would be improper.

Prater testified that at least one of the individuals by the front door was white, and she was not sure about the other one. According to Prater, they were both "on the taller side." The individual behind the car was black, "heavier set, but not like big; and the gentleman in the carport was black, and [she] believe[d] he had dreadlocks." She also said that he appeared to be "fairly scrawny," and was her height, which was about five feet, five inches tall. According to Prater, the individual with the dreadlocks was the person who fired the gun. Prater said that none of the people inside the house went outside to talk with the four individuals, and nobody attempted to call 9-1-1.

On cross-examination, Prater was questioned about a police report that had been taken near the time of the January 8 shooting. Prater said that, if the report stated that she told the police at that time that the shooting had occurred at 1:00 a.m. the following morning and was a separate incident from the four individuals being at the house, she would have no reason to dispute that. According to Prater, somebody in the house contacted 9-1-1 following the 1:00 a.m. shooting, but she was not sure who it was. Prater conceded that she smoked marihuana daily and that she may have been smoking it on the day of the shooting in January.

Anderson also testified about the incident at the Clearwood house on January 8. Anderson said, "There was one night where four or five boys -- I'm not quite sure exactly how many, I didn't actually get to see them -- came up to our house wearing hoods, and one of them knocked on the door." Anderson explained that Prater and one of her friends had been outside, and when they came back inside the house, they told him that there were a "bunch of people

13

outside with masks on." Anderson said that, at that point, everyone inside the house went outside, but by the time they got outside, nobody was there. According to Anderson, while he was at work the next day, someone shot at the house. Anderson said that, although he had not been there at the time of the shooting, a bullet "went through [his] window" and "lodged itself into the wall."

Without objection, Chris Taylor, a detective with the Longview Police Department (LPD) for seventeen years, testified as an expert witness in computer and telephone forensics. Taylor explained at length how he determined where a particular cell phone was located by looking at the cell phone tower data that had been used on a specific date and time, from both the caller's phone and the receiver's phone.[15] Taylor conceded that the process was "not an exact science." Taylor opined that, on the evening of January 8, Allison's cell phone had been in the general area of the Clearwood house. Taylor also conceded that Allison's phone was in use for about two hours around the time the shooting was believed to have occurred.

***Police Interview with Allison.*** Detective Armando Juarezortega, also with the LPD, testified that he had conducted a recorded interview with Allison. In the recording, which was admitted into evidence over Allison's objections,[16] Allison stated that he was born on May 4,

---

[15]The State offered, and the trial court admitted, Allison's cell phone records from the evening of January 8, 2017, which Taylor used to "do a map and tower location" on Allison's phone.

[16]Allison objections were based on relevancy and violations of Rules 401, 403, and 404(B) of the Texas Rules of Evidence. He also asked the trial court to give a limiting instruction. On appeal, Allison does not specifically complain about the introduction of the interview.

14

1996.[17]   According to Allison, on September 8, 2016, he had been in Tyler "with this girl." Juarezortega asked Allison if he would give Juarezortega the girl's telephone number so that he could verify that Allison had been in Tyler that day. Allison said he would have to ask the girl for her permission before he could give him that information. Allison then questioned Juarezortega on whether he knew of anyone who would testify that Allison had been involved in the robbery, to which Juarezortega answered that he was sure there would be someone who would testify to the allegation. In response, Allison laughed nervously, but he continued to maintain that he had not been involved. Juarezortega then asked Allison if he knew what the term "pull up a Carlo" meant. Allison denied knowing what it meant and told Juarezortega that, if given a choice, he would rather save that discussion for another day. Allison continued denying that he knew what the term meant, when another detective asked Allison if he knew what "to pull a Carlo" meant. Allison then responded by saying "to pull a Carlos," as opposed to Carlo. As the interview continued, Allison admitted that he had talked to T.K. on the phone while T.K. was in jail. Juarezortega told Allison that he would hear a recording of his conversation with T.K. during Allison's trial, which included T.K. asking Allison to "pull a Carlos" and Allison agreeing to do so. Allison repeatedly said that the words meant nothing; yet, he followed his comment by referring to the term as "slang." Juarezortega then questioned Allison about the January 8 shooting at the Clearwood house. Allison responded by telling Juarezortega that he wanted to see a video of the shooting.

_____

[17]Allison would have been around twenty years old at the time of the robbery.

Juarezortega also testified that he obtained Allison's telephone number through Verizon. Those records were admitted into evidence without objection.[18] Juarezortega said that the first time he had heard the phrase "pull a Carlo" or "pull a Carlos" was when he was listening to Allison and T.K.'s telephone call. Juarezortega explained that he repeatedly used the letters C-A-R-L-O when he was asking Allison what the word meant. Yet, Allison was the first person to refer to the word as C-A-R-L-O-S, which was also the way T.K. had pronounced the word during their phone call.

Juarezortega also testified that, in his opinion, Allison matched Jimenez's description of the unidentified masked individual who had been described as being in the Clearwood house on September 8; that is, a "black male, scrawny, possibly taller than five-eight, dark skinned[.]" Based on the information that had been gathered in the investigation, Juarezortega testified that he believed Allison had been involved in the September 8 aggravated robbery.

*(1)     Sufficient Evidence Corroborated the Co-Defendant's Testimony*

In his first point of error, Allison contends that the State presented insufficient evidence to corroborate the testimony of his co-defendant, R.J., who identified Allison as the fourth participant in the aggravated robbery.[19] Allison argues that the only non-accomplice evidence to

---

[18]Juarezortega subpoenaed Allison's cell phone records.

[19]In its indictment against Allison, the State alleged that, on or about September 8, 2016, Allison
> did then and there while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally, knowingly, or recklessly caused bodily injury to Jose Jimenez by shooting a firearm in [his] direction . . . and [Allison] did then and there use or exhibit a deadly weapon, to-wit: a firearm.

connect Allison to the September 8 robbery was Allison's alleged involvement in the January 8 shooting. That evidence, according to Allison, was less than persuasive.

The State has the burden to corroborate an accomplice's testimony. An accomplice witness is a person who could be convicted of the offense with which the accused has been charged.[20] *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). "A conviction cannot be had [on] the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; the corroboration is not sufficient if it merely shows the commission of the offense." *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14.

"In order to determine whether the accomplice witness(es)' testimony is corroborated we eliminate all accomplice evidence from the record and determine whether the other inculpatory facts and circumstances in evidence tend to connect appellant to the offense." *Munoz*, 853 S.W.2d at 559; *Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd).

> No precise rule can be formulated as to the amount of evidence required to corroborate. The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. Nor must the non-accomplice evidence directly link the accused to the commission of the offense. While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

---

[20]It is uncontested that R.J. was an accomplice.

17

*Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (citations omitted). "Apparently insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of the accomplice . . . testimony." *Paulus v. State*, 633 S.W.2d 827, 844 (Tex. Crim. App. 1981) (citing *Holmes v. State*, 157 S.W. 487 (Tex. 1913)). We review the corroborating evidence in the light most favorable to the jury's verdict. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

Contrary to Allison's argument that the January 8 shooting was the *only* evidence corroborating R.J.'s accomplice-witness testimony, we find that the State presented other evidence that tended to connect Allison to the aggravated robbery. First, the January 7 recording of T.K. and Allison's telephone conversation tends to connect Allison to the aggravated robbery. During their conversation, Allison described a person who had been shot in the head, which was the area of the body where Jimenez had been shot. Allison also described three or four people attempting to steal something, which was also a similar description of what had happened during the robbery. When T.K. said, "We all's in there together," Allison agreed with him. In fact, the entire telephone conversation related to what was being said "in the streets[,]" the robbery, and how their names got out as being involved in the offense. They also discussed how Allison and T.K. should handle the situation. Allison also referred to Jose, which is Jimenez's first name, followed by, "Oh yeah, you were in there."

Jimenez testified that, just before he passed out after he was shot, he heard someone say, "[G]o get T.K. . . . I want to kill this fool." Jimenez also described one of the intruders as black,

18

dark-skinned, and "lanky" or "scrawny," which matched Allison's physical description. Jimenez said that the suspects were no older than twenty-two years old, a very close estimate of Allison's age.

The jury also saw the video of Allison being interrogated by Juarezortega relative to the September 8 aggravated robbery in which Allison appeared nervous and fidgety. Juarezortega testified that, in his opinion, Allison matched the description of the unidentified masked individual who had been identified as being in the Clearwood house on September 8, describing Allison as a "scrawny," "dark," "black male." Moreover, Juarezortega said that, after completing his investigation, it was his opinion that Allison had been involved in the aggravated robbery.

Having reviewed the totality of the non-accomplice-witness testimony, we find that a rational juror could have found that the evidence tended to connect Allison to the aggravated robbery. *See Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988) ("combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test"). As a result, we conclude that there is sufficient evidence to support Allison's conviction. We, therefore, overrule Allison's first point of error.

*(2)    Admitting Testimony on the Meaning of "Pull a Carlos" Was Harmful Constitutional Error*

At trial, the State offered the testimony of LPD Detective Jayson Reed as to the meaning of the phrase to "pull a Carlos."  In his third point of error, Allison contends that Reed's testimony relating to the meaning of the phrase violated (1) evidentiary rules and (2) his constitutional right to confront an adverse witness.  We agree that this violated Allison's right of confrontation and conclude that the constitutional error was harmful.

Prior to Reed's testimony before the jury, the trial court held a hearing outside the presence of the jury.  Reed testified that he had been employed with the LPD for about twenty-eight years.  When he was first hired, Reed worked in the patrol division for about a year and a half, then worked in the street crimes unit for several years.  Around 2000, Reed began working with the County Organized Drug Enforcement Unit (Code), and he remained there for about thirteen or fourteen years.  Around 2016, Reed took a full-time position "attached to the FBI task force" in Tyler.  Reed testified that, during his time in law enforcement, there was "a lot of open air market drug dealing where there was like standing on street corners, we had vehicles just pull up, and they were doing open air deals on the street."  According to Reed, he dealt mostly with narcotics and gang-related crimes, while also executing warrants and gathering intelligence.

As a result of his work, Reed dealt with many informants[21] and was familiar with victims and suspects involved in the narcotics trade.  Reed stated that there had been occasions when he

---

[21]Reed explained that the meaning of "a source" and "a cooperating witness" differed; the first usually referring to a person who does not receive anything in exchange for the information he gives to a detective and the latter referring

might not be familiar with a particular name, term, event, or situation. If that happened, Reed said he might contact other police agencies or "somebody that knows somebody and their informant knows somebody in between" and then locate "somebody close to let [them] know what's going on." Reed gave examples of slang terms that might be outside a layperson's vernacular, such as "one plug,"[22] "ice,"[23] "eight ball,"[24] "teenager,"[25] "ice cream,"[26] "hard and soft,"[27] and "wet."[28] Reed explained that there had been occasions when he was unfamiliar with a particular slang term. When that happened, he would ask informants or his sources what the term or word meant.

As for the slang term "pull a Carlos," Reed said he was initially unaware of its meaning. About three weeks before Allison's trial, the prosecutor, who also happened to be Reed's wife, asked Reed if he could talk to one of his sources or an informant to find out what the term meant. Reed then spoke to a cooperating source, whom he had known since 1998 and whom he believed

---

to "somebody that's willing to work for [law enforcement], whether it is they are working a case off" or expecting an officer to "go to bat for them with the district attorney's office." Sometimes, a cooperating witness will work with law enforcement "for nothing but just for money." Reed also explained that a "confidential informant" was similar to a cooperating witness. "It's just that they may not ever want their name on a piece of paper."

[22]"One plug" refers to a source of information.

[23]"Ice" refers to methamphetamine.

[24]"Eight ball" refers to three and one-half grams.

[25]"Teenager" refers to a sixteenth of a gram.

[26]"Ice cream" refers to methamphetamine.

[27]"Hard" refers to crack cocaine, and "soft" refers to powder cocaine.

[28]"Wet" refers to PCP.

to be credible, and asked him what the term "pull a Carlos" meant. According to Reed, he did not tell the source the reason he was asking for the information. Reed testified that the source immediately told him that the slang term meant "basically doing a shooting" to "take care of a witness." Reed also spoke to LPD Officer Chris Bethard and an investigator with the district attorney's office, Hall Reavis, and their interpretation of the term coincided with the version given by Reed's source.

On cross-examination, Allison asked Reed whether he had ever been certified in the area of slang terminology. In response, Reed said that he had never been certified or qualified in any area specifically related to slang terminology. Reed also agreed that he had relied on his source and the other two individuals to "decipher" the slang term at issue.[29]

At the end of the hearing, Allison objected to the State's proffer of Reed as an expert in the area of slang terminology, arguing that he was not qualified, that he had not been allowed to cross-examine the individuals who explained the meaning of the slang term to Reed, and that Reed's testimony was hearsay and a violation of the Confrontation Clause. The trial court overruled Allison's objection.

Allison contends that the admission of Reed's testimony in relation to the meaning of "pull a Carlos" violated the Confrontation Clause of the United States Constitution. We agree.

The Confrontation Clause of the Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

---

[29]Reed stated that he had also contacted another confidential source, but that individual did not know the meaning of the slang term "pull a Carlos."

the witnesses against him." U.S. CONST. amend. VI. "Witnesses" are those individuals who "bear testimony" against the accused, offering a declaration or affirmation made for the purpose of establishing or proving a fact. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). The Confrontation Clause prohibits a trial court from admitting testimonial statements by a witness who is absent from trial unless the witness is (1) unable to testify and (2) the defendant had an adequate opportunity to cross-examine him. *Infante v. State*, 404 S.W.3d 656, 664 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Yet, the Confrontation Clause does not apply to all out-of-court statements introduced at trial; instead, it applies only to hearsay that is "testimonial" in nature. *Sanchez v. State*, 354 S.W.3d 476, 485 (Tex. Crim. App. 2011).

The *Crawford* Court explained that there are three different circumstances that would be considered testimonial evidence: (1) "*ex parte* in-court testimony or its functional equivalent," like affidavits, custodial examinations, prior testimony not subject to cross-examination, or "similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (2) "extrajudicial statements" of the same nature "contained in formalized testimonial materials," and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51–52. "The Court further explained that the term 'testimonial' applies 'at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.'" *Spencer v. State*, 162 S.W.3d 877, 879 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (quoting *Crawford*, 541 U.S. at 68)).

23

"The timing, purpose, and setting of a challenged statement can be relevant considerations when determining whether the statement's primary purpose is testimonial." *Lollis v. State*, 232 S.W.3d 803, 806 (Tex. App.—Texarkana 2007, pet. ref'd) (citing *Davis v. Washington*, 547 U.S. 813, 821 (2006)).

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[30]

*Id.*

Notably, once an appellant objects to the admission of the complained-of testimony, under *Crawford*, the burden shifts to the State, as the proponent of the evidence, to establish that it was admissible under *Crawford*. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008) (citing *Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008)). Thus, "[t]he State was obligated to establish either (1) that the [testimony] did not contain testimonial hearsay statements or (2) that the [testimony] did contain testimonial hearsay statements but that such statements were nevertheless admissible under *Crawford.*" *See id.* at 681. In this case, the State failed to meet either of those prerequisites.

---

[30]When an appellate court determines whether a declarant's out-of-court statements to a police officer are testimonial, it looks to the nonexclusive factors of (1) whether the situation was still in progress, (2) whether the questions sought to determine what is presently happening as opposed to what had happened in the past, (3) whether the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime, (4) whether the questioning was conducted in a separate room, away from an alleged assailant, and (5) whether the events were deliberately recounted in a step-by-step basis. *Davis*, 547 U.S. at 826–27; *Martinez v. State*, 236 S.W.3d 361, 371 (Tex. App.—Fort Worth 2007, pet. dism'd, untimely filed).

24

Whether a statement is testimonial is a question of law. *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010) (quoting *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008)). An appellate court defers to the trial court's determination of credibility and historical fact and reviews de novo the constitutional question of whether the facts, as found by the trial court, establish that the out-of-court statement is testimonial. *Id.*

"The primary focus in determining the threshold issue of whether a hearsay statement is 'testimonial' is [based on] the objective purpose of the interview or interrogation, not upon the declarant's expectations." *Paul v. State*, 419 S.W.3d 446, 454–55 (Tex. App.—Tyler 2012, pet. ref'd) (citing *Davis v. Washington*, 547 U.S. 813, 822–23 (2006)); *De La Paz*, 273 S.W.3d at 680. In *Davis v. State*, 169 S.W.3d 660 (Tex. App.—Austin 2005), *aff'd*, 203 S.W.3d 845 (Tex. Crim. App. 2006), the Austin Court of Appeals explained,

> A statement is more likely to be testimonial if the person who heard, recorded, and produced the out-of-court statement at trial is a government officer. If the person obtaining the statement is a governmental employee or police officer carrying out an investigation or [prosecutorial] functions, the statement is "testimonial."

*Id.* at 667.

Here, the cooperating source's statement was in direct response to questioning by Reed, who had been asked by the State during its preparation for trial to find out what the slang term "pull a Carlos" meant. The question was not asked in response to an emergency and did not uncover background information. The source's statement was procured specifically to be used against Allison at trial. Moreover, it was solely offered for the truth of the matter asserted; that

25

is, "pull a Carlos" meant to shoot someone. And the information given to Reed by his source was directly relevant to the State's theory of Allison's consciousness of guilt. We, therefore, believe that "the surrounding circumstances objectively indicate[d] that the primary purpose" of the informant's statement was "to establish or prove past events potentially relevant to later criminal prosecution." *See De La Paz*, 273 S.W.3d at 680.

The State also failed to show that the source's statement was reliable. Nor did it establish that the statement was "firmly rooted [in a] hearsay exception." *See Blaylock v. State*, 259 S.W.3d 202, 206 (Tex. App.—Texarkana 2008, pet. ref'd) (citing *Crawford*, 541 U.S. at 58–60, 68). Other than stating that it could not disclose the declarant's name because he was a cooperating source, the State did not offer any proof that the source was unable to testify or that the defendant had the opportunity to cross-examine him. *Id.* Accordingly, Allison was not given an adequate opportunity to cross-examine the source. Only the source would be able to testify as to why, when, how, and on what basis he had reached the conclusion that "pull a Carlos" meant to shoot someone. Allison had a right to ask him those questions.

Finally, Reed did not testify regarding any independent judgment that he may have formed based on his own testing and/or analysis. The record indicates that Reed merely recited what he learned from his cooperating source, Bethard, and Reavis and adopted those findings as his own. "We agree that 'allowing a witness to simply parrot . . . out-of-court testimonial statements directly to the jury in the guise of expert opinion' would provide an end run around *Crawford*, and this we are loathe to do." *Johnson v. State*, Nos. 05-09-00494-CR & 05-09-

26

00495-CR, 2011 WL 135897, at *4 (Tex. App.—Dallas Jan. 18, 2011, no pet.) (not designated for publication)[31] (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)).

Under the circumstances of this case, we find that the disclosure of the out-of-court statements underlying Reed's opinion constituted the use of testimonial statements to prove the truth of the matter asserted in violation of the Confrontation Clause.

"Because there was constitutional error, we must reverse [Allison's] conviction unless we are satisfied beyond a reasonable doubt that error did not contribute to the conviction or punishment." *Wood v. State*, 299 S.W.3d 200, 214 (Tex. App.—Austin 2009, pet. ref'd) (citing TEX. R. APP. P. 44.2(a)). "The emphasis of a harm analysis pursuant to Rule 44.2(a) should not be on the propriety of the outcome of the trial." *Coffey v. State*, 435 S.W.3d 834, 843 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)). "[T]he question for the reviewing court is not whether the jury verdict was supported by the evidence. Instead, the question is whether the constitutional error actually contributed to the jury's deliberations in arriving at that verdict." *Id.* (quoting *Scott*, 227 S.W.3d at 690). As the Texas Court of Criminal Appeals explained,

> In determining specifically whether constitutional error under *Crawford* may be declared harmless beyond a reasonable doubt, we recently observed that the following factors are relevant: 1) how important was the out-of-court statement to the State's case; 2) whether the out-of-court statement was cumulative of other evidence; 3) the presence or absence of evidence corroborating or contradicting the out-of-court-statement on material points; and 4) the overall strength of the prosecution's case. As the court of appeals rightly noted, the emphasis of a harm

---

[31]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

> analysis pursuant to Rule 44.2(a) should not be on "the propriety of the outcome of the trial." That is to say, the question for the reviewing court is not whether the jury verdict was supported by the evidence. Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict—whether, in other words, the error adversely affected "the integrity of the process leading to the conviction."

*Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007) (footnotes omitted) (citations omitted). "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting TEX. R. APP. P. 44.2(a)).

We examine the above factors set out for a harm analysis.

The out-of-court statement was important to the State's case. The State maintained that it needed Reed's testimony as to the meaning of the term "pull a Carlos" to show that, four months after the aggravated robbery, Allison allegedly shot at the Clearwood house attempting to eliminate any witnesses to the charged robbery. According to the State, the January 8 shooting was evidence that Allison was guilty of the September 8 aggravated robbery. In other words, there would have been no need to commit the shooting or—to "pull a Carlos"—but for Allison's need to cover up his guilt for committing the aggravated robbery.

This record strongly suggests that the State needed, or at least believed that it needed, this evidence. The State spent a significant amount of trial time dealing with the January 8 shooting. The State brought up the January 8 shooting through several witnesses, including Prater,

28

Benicaso, Anderson, Juarezortega, and Taylor. It was mentioned every day during the four-day guilt/innocence phase of the trial. The State clearly had trouble linking Allison to the January 8 shooting. In fact, there was no other evidence linking Allison to the January 8 shooting: no DNA evidence and no identification by a witness. Contrary to the State's position, one witness (Prater) described the shooter as having dreadlocks, which Allison did not have. Cell phone records were used to try to put Allison in the vicinity of the January 8 shooting when it occurred; evidence suggested that Allison's cell phone was in use at the time of the shooting but also that T.K.'s residence was located just a few blocks from the shooting. Without Reed's testimony, there was effectively no evidence linking Allison to the January 8 shooting.

As a result, this factor weighs in favor of a finding of harm.

Another factor is whether the out-of-court statement was cumulative of other evidence. Because this out-of-court statement was not cumulative of other evidence, this factor weighs in favor of a finding of harm.

The challenged testimony concerning the meaning of "pull a Carlos" stands alone, without corroborating or conflicting evidence. This factor weighs in favor of a finding of harm.

Finally, we consider the overall strength of the State's case. The State presented direct evidence connecting Allison to the aggravated robbery on September 8. The jury heard from R.J., who was an accomplice and eyewitness to the crime. R.J. testified, among other things, that Allison was present before, during, and after the aggravated robbery. And, although it was not as compelling as R.J.'s testimony, the jury also heard a recording of the telephone call between

29

Allison and T.K., in which Allison and T.K. referred directly to Jimenez and also discussed shooting someone in the head. In fact, the overall crux of that telephone conversation was about the robbery, how their names got out, and how they were going to take care of the situation. The jury could very well have inferred that Allison and T.K. were referring to the September 8 aggravated robbery.

And, to be sure, the trial court gave a limiting instruction about the January 8 shooting, instructing the jury that they were prohibited from considering the evidence unless they found beyond a reasonable doubt that Allison had committed the January 8 offense, and without evidence to the contrary, we ordinarily presume that the jury followed the trial court's instructions. *See Riley*, 447 S.W.3d at 931. But, without Reed's testimony, nothing would connect Allison with the January 8 shooting, rendering the evidence legally insufficient on that point. We should not, therefore, find that this limiting instruction weighs against a finding of harm.

Based on the foregoing analysis and a consideration of Reed's testimony regarding the meaning of the term to "pull a Carlos" in the context of the entire trial, there is a reasonable possibility that the admission of the complained-of evidence "moved the jury from a state of non-persuasion to one of persuasion on a particular issue" during the guilt/innocence phase of Allison's trial. *See Almaguer v. State*, 492 S.W.3d 338, 359 (Tex. Crim. App. 2014) (quoting *Scott*, 227 S.W.3d at 690–91). We, therefore, conclude that the Confrontation Clause violation of which Allison complains was not harmless beyond a reasonable doubt.

We sustain Allison's third point of error, reverse the trial court's judgment, and remand for a new trial.[32]

Josh R. Morriss, III
Chief Justice

CONCURRING OPINION

I concur with the majority opinion. I write separately to explain why I believe that the trial court's error was harmful under Rule 44.2(a) of the Texas Rules of Appellate Procedure.

Rule 44.2(a) of the Texas Rules of Appellate Procedure states:

> *Constitutional Error.* If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

TEX. R. APP. P. 44.2(a). Rule 44.2(b) states, "*Other Errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). Neither rule states which party bears the burden of establishing harm or harmlessness. Instead, one must resort to caselaw to determine the answer to that question.

---

[32]We also agree with Allison that admitting evidence of the January 8 extraneous offense was error; because of our disposition above, however, we do not conduct a harm analysis on that point.

The Court of Criminal Appeals has held that "[n]either Appellant nor the State has any formal burden to show harm or harmlessness under Rule 44.2(b)." *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (citing *Burnett v. State*, 88 S.W.3d 633, 638 (Tex. Crim. App. 2002)). Instead, "it is the reviewing court's duty to assess harm after conducting a proper review of the record to determine the influence the error had in light of all the other evidence." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 762 (1946)). By contrast, the United States Supreme Court has held that, in constitutional error cases, "the standard of review 'requir[es] the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Wall v. State*, 184 S.W.3d 730, 746 n.53 (Tex. Crim. App. 2006) (quoting *Chapman v. California*, 386 U.S. 18, 23–24 (1967)). Accordingly, a key distinction between the constitutional and non-constitutional harm standards is that—where constitutional error exists—the State bears the burden of proving harmlessness beyond a reasonable doubt. And, significantly, this is a federal standard applicable to state courts via the Fourteenth Amendment to the United States Constitution, which the state courts have no power to ignore. *Chapman v. California*, 386 U.S. 18, 21 (1967) ("We have no hesitation in saying that the right of these petitioners not to be punished for exercising their Fifth and Fourteenth Amendment right to be silent—expressly created by the Federal Constitution itself—is a federal right which, in the absence of appropriate congressional action, it is our responsibility to protect by fashioning the necessary rule.").[33]

---

[33]In *Kooteakos v. United States*, the Supreme Court discussed the origin of the federal harmless error rule, noting

Yet, creating such a burden is one thing; defining how the burden works is quite another.

As the Court of Criminal Appeals has reasoned with respect to non-constitutional error,

> Burdens and requirements of proving actual facts are appropriate in the law of evidence, but they have little meaning for the harmless-error decision.
>
> > In evaluating what effect, if any, an error had on the jury's verdict, the appellate court may look only to the record before it. The function of a party carrying the burden is simply to suggest, in light of that record, how prejudice may or may not have occurred. At that point, the court makes its own assessment as to what degree of likelihood exists as to that prejudicial or non-prejudicial impact, and then applies to that assessment the likelihood-standard of the particular jurisdiction.

---

that "'the harmless error statute,' § 269 of the Judicial Code, as amended, 28 U.S.C. § 391," *Kotteakos v. United States*, 328 U.S. 750, 757 (1946),

> grew out of widespread and deep conviction over the general course of appellate review in American criminal causes. This was shortly, as one trial judge put it after § 269 had become law, that courts of review, "tower above the trials of criminal cases as impregnable citadels of technicality." So great was the threat of reversal, in many jurisdictions, that criminal trial became a game for sowing reversible error in the record, only to have repeated the same matching of wits when a new trial had thus been obtained.

*Id.* at 759 (footnote omitted) (citation omitted). The Supreme Court then noted that the intent behind Section 269 was simple, to substitute judgment for automatic application of rules; to preserve review as a check upon arbitrary action and essential unfairness in trials, but at the same time to make the process perform that function without giving men fairly convicted the multiplicity of loopholes which any highly rigid and minutely detailed scheme of errors, especially in relation to procedure, will engender and reflect in a printed record. *Id.* at 759–60. The Supreme Court continued,

> But that this burden does not extend to all errors appears from the statement which follows immediately. "The proposed legislation affects only technical errors. If the error is of such a character that its natural effect is to prejudice a litigant's substantial rights, the burden of sustaining a verdict will, notwithstanding this legislation, rest upon the one who claims under it."

*Id.* at 760–61 (quoting H.R. Rep. No. 913, 65th Cong., 3d Sess., 1). The Supreme Court then elaborated, "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, *except perhaps where the departure is from a constitutional norm or a specific command of Congress*." *Id.* at 764–65 (emphasis added) (footnote omitted) (citation omitted). In *Chapman*, the Supreme Court "fashion[ed] a harmless-constitutional-error rule" applicable to state courts via the Fourteenth Amendment, *Chapman*, 386 U.S. at 21, 22–24, to govern cases falling within the *Kotteakos* exception.

*Ovalle v. State*, 13 S.W.3d 774, 788 (Tex. Crim. App. 2000) (per curiam) (quoting WAYNE R.

LAFAVE, ET AL., CRIMINAL PROCEDURE § 1165 (2d ed. 1992)).

Logically, if "[b]urdens and requirements of proving actual facts . . . have little meaning

for the harmless-error decision," it would follow that imposing a burden of proof in

constitutional error cases under Rule 44.2(a) would be just as meaningless. Not surprisingly,

therefore, we—and other appellate courts—have stated the constitutional harmless error standard

under Rule 44.2(a) in terms suggesting that neither party bears a burden of establishing

harmlessness and that the appellate courts have an independent duty to determine that question.[34]

For example, in *Whitehead v. State*, we held,

> When confronted with [a constitutional] error, we must reverse unless we
> conclude beyond a reasonable doubt that the error did not contribute to the
> conviction. We focus not on the perceived accuracy of the conviction, but instead
> on the error itself, in the context of the trial as a whole, to determine the
> likelihood that the error "genuinely corrupted the fact-finding process." We
> consider the nature of the error, the extent it was emphasized by the State, the
> probable implications of the error, and the weight a juror would probably place on
> the error. Our analysis should take into account "any and every circumstance
> apparent in the record that logically informs" our determination of whether the
> error contributed to the conviction beyond a reasonable doubt.

*Whitehead v. State*, 437 S.W.3d 547, 552 (Tex. App.—Texarkana 2014, pet. ref'd) (quoting

*Snowden v. State*, 353 S.W.3d 815, 819 (Tex. Crim. App. 2011)). In many similar cases, one

---

[34]In fact, Rule 44.2(a) itself suggests there is no burden of proof in constitutional error cases by stating that "the court of appeals must reverse a judgment of conviction or punishment unless *the court determines* beyond a reasonable doubt that the error did not contribute to the conviction or punishment," TEX. R. APP. P. 44.2 (emphasis added), rather than stating, as required under *Chapman* and its progeny, that "the court of appeals must reverse a judgment of conviction or punishment unless [*the State proves*] beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *See Chapman*, 366 U.S. at 24.

would search in vain for any reference to the State's burden to prove harmlessness beyond a reasonable doubt.[35]  And given the reasoning in *Ovalle*, it is easy to understand why.

Nevertheless, the United States Supreme Court has reaffirmed the State's burden to prove harmlessness in constitutional error cases many times since *Chapman*, including as recently as 2017. *See Weaver v. Massachusetts*, 137 S.Ct. 1899, 1907 (2017) ("In *Chapman . . .*, this Court 'adopted the general rule that a constitutional error does not automatically require reversal of a conviction'" and therefore, "[i]f the government can show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained,' . . . then the error is deemed harmless and the defendant is not entitled to a reversal." (quoting *Chapman*, 386 U.S. at 24 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991)))); *Sullivan v. Louisiana*, 508 U.S. 275, 278–79 (1993) ("In *Chapman* . . . [w]e held that the Fifth Amendment violation of prosecutorial comment upon the defendant's failure to testify would not require reversal of the conviction if the State could show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (quoting *Chapman*, 386 U.S. at 24)); *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993) (noting that, in *Chapman*, "we held that 'before a federal constitutional error can be harmless, the court must be able to declare a belief that it was

---

[35]In *Whitehead*, we noted,

> The State contends that the jury was unlikely to naturally and necessarily interpret its argument as a comment on Whitehead's failure to testify because the jury already heard "[Whitehead's] side of the story" from "other [unnamed] witnesses and from [Whitehead] herself in videotaped interviews" played during trial. . . . While this argument may affect the potential gravity of the error, we cannot conclude that the jury would reasonably interpret the State's argument as simply referring to Whitehead's statements to law enforcement.

*Id.* at 552.  However, we did not discuss whether either party bore the burden of proving harm or harmlessness under Rule 44.2(a).

harmless beyond a reasonable doubt,'" (quoting *Chapman*, 386 U.S. at 24), and "[t]he State bears the burden of proving that an error passes muster under this standard"); *Arizona v. Fulminante*, 499 U.S. 279, 297 (1991) ("Our review of the record leads us to conclude that the State has failed to meet its burden of establishing, beyond a reasonable doubt, that the admission of Fulminante's confession . . . was harmless error."); *Satterwhite v. Texas*, 486 U.S. 249, 258– 59 (1988) ("The question, however, is not whether the legally admitted evidence was sufficient to support the death sentence . . . but . . . whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict . . . .'" (quoting *Chapman*, 386 U.S. at 24)); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 159 (2006) (Alito, J., dissenting) ("To be sure, when the effect of an erroneous disqualification [of the defendant's chosen counsel] is hard to gauge, the prosecution will be unable to meet its burden of showing that the error was harmless beyond a reasonable doubt.").[36]

---

[36]In *O'Neal v. McAninch*, the Supreme Court stated,

> As an initial matter, we note that we deliberately phrase the issue in this case in terms of a judge's grave doubt, instead of in terms of "burden of proof." The case before us does not involve a judge who shifts a "burden" to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. . . . As Chief Justice Traynor said:
>
>> Whether or not counsel are helpful, it is still the responsibility of the . . . court, once it concludes there was error, to determine whether the error affected the judgment. It must do so without benefit of such aids as presumptions of allocated burdens of proof that expedite fact-finding at the trial.

*O'Neal v. McAninch*, 513 U.S. 432, 436–37 (1995) (quoting R. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 26 (1970)). Nevertheless, *O'Neal* was a federal habeas corpus proceeding, and in such cases the Supreme Court has rejected the *Chapman* harmlessness standard for constitutional errors in favor of the non-constitutional harm standard in *Kotteakos*. *See Brecht*, 507 U.S at 637 (citing *Kotteakos*, 328 U.S. at 776.) ("The imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error. The *Kotteakos* standard, we believe, fills the bill.").

Yet, finding a case that specifically defines the procedure by which the prosecution must meet its burden of proof to show harmlessness beyond a reasonable doubt is a daunting task. Although the Supreme Court has "appeared to move back and forth between relying heavily upon the presence of proof of guilt in its harmless error analysis and considering that proof as less central to the inquiry," *Snowden*, 353 S.W.3d at 819 n.14 (quoting WAYNE R. LAFAVE, ET AL., 7 CRIMINAL PROCEDURE § 27.6(e) (3d ed. 2007)), it has not clarified the procedure by which the State is to satisfy those standards.[37] And the Court of Criminal Appeals is correct that burdens of proof are generally issues for trial, whereas appellate courts evaluate the law. Nevertheless, by reviewing the nature of burdens of proof in general, one can see three possible interpretations of the *Chapman* burden that are workable notwithstanding the problems discussed in *Ovalle*.

---

Also, in some direct appeal cases, the Supreme Court has discussed the *Chapman* standard without mentioning the State's burden of proof, but the opinions reveal that the prosecution attempted to meet its burden in those cases. *See Delaware v. Van Arsdall*, 475 U.S. 673, 677 (1986) ("The [Delaware Supreme Court] rejected the State's argument that since 'Fleetwood's basic testimony was cumulative in nature and unimportant,' the Confrontation Clause error was harmless beyond a reasonable doubt." (quoting *Van Arsdall v. State*, 486 A.2d 1, 7 (Del. 1984))); *Neder v. United States*, 136 F.3d 1459, 1465 (11th Cir. 1998) ("[T]he government must show that Neder was not prejudiced by the district court's . . . error. The government has met that burden . . . . " (citations omitted)), *aff'd in part, rev'd in part*, *Neder v. United States*, 527 U.S. 1 (1999). Thus, the Supreme Court has been consistent in its holding that, on direct appeal of cases involving constitutional error, the "beneficiary of a constitutional error [must] prove beyond a reasonable doubt" that the error was harmless. *Chapman*, 386 U.S. at 23–24.

[37]The United States Supreme Court has also held that "[t]o say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Snowden* 353 S.W.3d at 819 n.15 (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991)). It has further held that "the issue under *Chapman* is 'whether the . . . verdict actually rendered in this trial was surely unattributable to the error.'" *Id.* (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

In a trial court, the State bears both the burden of production of evidence and the burden of persuasion as to each element of the offense charged, beyond a reasonable doubt. *See Alford v. State*, 806 S.W.2d 581, 585 (Tex. App.—Dallas 1991), *aff'd*, 866 S.W.2d 619 (Tex. Crim. App. 1993). On appeal, the State still carries the burden of persuasion, but the record is closed, and there is no further opportunity to produce evidence to the appellate court. However, the *Chapman* burden could be interpreted as holding that, when the State suspects the trial court has committed constitutional error while the trial is ongoing, it must seek to minimize the harm—by, for example, not relying on the error in final argument—in order to establish on appeal that the error was harmless beyond a reasonable doubt. Alternatively, the burden could be interpreted as requiring the State, on appeal, to produce evidence to the appellate court in the sense that it directs the appellate court to specific factors in the record upon which the appellate court can find harmlessness beyond a reasonable doubt. Or third, the *Chapman* burden could be interpreted as holding that the State has both burdens at trial and on appeal.

Yet, what is clearly ruled out by *Chapman* is the interpretation that the State has no burden to do anything at all and simply rely on the appellate court to figure it all out on appeal. Such an interpretation would eliminate the State's burden to prove harmlessness beyond a reasonable doubt.[38] Accordingly, at a minimum, before an appellate court can evaluate the

---

[38]When one looks at the development of the harmless error rule in the Supreme Court, it is easy to understand why leaving it to the appellate court to resolve harmlessness on its own volition does not satisfy the constitutional requirements. In *Chapman*, the Supreme Court made three rulings: (1) not all constitutional errors automatically require reversal, (2) in cases where the constitutional error is not automatically reversible, the State, as beneficiary of a constitutional error, has the burden to prove that the error was harmless by showing that the error did not

38

*Snowden* factors, the State must brief the appellate court about why the record supports a finding

of harmlessness beyond a reasonable doubt.[39]

In this case, the State did not brief the issue of harmless error. If we had an independent

duty to analyze the *Snowden* factors, then—as my colleagues aptly demonstrate—it is

---

contribute to the conviction, and (3) the standard by which the State must prove harmlessness is beyond a reasonable doubt. *Chapman*, 386 U.S. at 23–24. *Chapman* is chiefly cited for its first holding that not every constitutional error was harmless per se, thereby laying a foundation for the distinction between structural error and trial errors as was recognized in *Fulminante*. *Fulminante*, 499 U.S. at 306 ("Since this Court's landmark decision in *Chapman*, . . . in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless."). And, as noted previously, the Supreme Court has alternated between focusing on the weight of the evidence in determining harmlessness and the error's contribution to the conviction notwithstanding the weight of the evidence.

Nevertheless, although the Supreme Court rejected automatic reversal for all constitutional errors, it did not render all constitutional errors automatically harmless either; instead, the Supreme Court granted the State an opportunity to salvage a conviction involving non-structural constitutional errors by proving that the error was harmless beyond a reasonable doubt:

> In *Chapman*, . . . this Court "adopted the general rule that a constitutional error does not automatically require reversal of a conviction." *If* the government can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," the Court held, then the error is deemed harmless and the defendant is not entitled to reversal.

*Weaver*, 137 S.Ct. at 1907 (emphasis added) (quoting *Fulminante*, 499 U.S. at 306; *Chapman*, 386 U.S. at 24). The Supreme Court went on to note in *Weaver* that, "[d]espite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'" *Id.* at 1910 (quoting *Chapman*, 386 U.S. at 24). Consequently, the Supreme Court did not place the onus on the appellate court to determine whether the constitutional error was harmless notwithstanding the State's failure to address the issue, but instead, granted the State the right to prevent reversal by proving to the appellate court that the constitutional error was harmless beyond a reasonable doubt.

[39]The Supreme Court's analysis in *Chapman* and subsequent cases suggests that more is required than the mere avoidance of briefing waiver or "simply to suggest, in light of that record, how prejudice may or may not have occurred." *Ovalle*, 13 S.W.3d at 787. Rather, the only reasonable interpretation of the clearly established *Chapman* standard of review would be that the State, "as beneficiary of the error," must direct the appellate court to specific factors in the record supporting a finding of harmlessness beyond a reasonable doubt before the appellate court has any duty to consider the *Snowden* factors. In other words, the State must do more than state generally that the record supports a finding of harmlessness. And if the State fails to satisfy that burden of production, the appellate court should reverse the judgment without further analysis because it is pointless to consider whether the State has met its burden of persuasion if it has failed to first meet its burden of production. Any other interpretation would render the State's burden "to prove beyond a reasonable doubt" that the error was harmless, meaningless and would, therefore, be unreasonable. *Chapman*, 386 U.S. at 23–24. It is sufficient to note here, however, that the State failed to even brief the issue.

conceivable that judges could reach different conclusions about whether the trial court's error was harmless. Nevertheless, the Supreme Court has consistently held, for more than fifty years, that the State has that burden and, therefore, that we do not. Consequently, we have no obligation to consider the *Snowden* factors in this case. Rather, in the absence of any effort by the State in this case, we should simply reverse the judgment because it is impossible to find that the State has met its burden "as beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Wall*, 184 S.W.3d at 746 n.53 (quoting *Chapman*, 386 U.S. at 23–24).

Accordingly, while I agree with the majority that the error was harmful, I do not reach that conclusion because I have a reasonable doubt after applying the *Snowden* factors to the record. Rather, I reach that conclusion because the error at issue was constitutional, and in such cases, we are required to "reverse unless" the State as "beneficiary of [the] constitutional error . . . prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting Chapman, 386 U.S. at 24). Because the State made no attempt to meet its constitutionally imposed burden to prove harmlessness beyond a reasonable doubt, we must reverse the opinion without consideration of the *Snowden* factors. For this reason, I concur with the majority opinion.


                                        Ralph K. Burgess
                                        Justice

**DISSENTING OPINION**

I agree with the majority opinion's conclusion that the disclosure of the out-of-court statement underlying Reed's opinion constituted the use of a testimonial statement to prove the truth of the matter asserted in violation of the Confrontation Clause. Even so, for these reasons, I respectfully disagree with the majority's harmless error analysis.

According to the State, it needed Reed's testimony on the meaning of the phrase "pull a Carlos" to show that Allison allegedly attempted to eliminate any witnesses to the September 8 aggravated robbery and to show his consciousness of guilt. But the State's reasoning on need is specious. The State had strong evidence proving that Allison participated in the aggravated robbery on September 8. First, the jury heard from R.J., who was an accomplice and eyewitness to the aggravated robbery. R.J. testified that he was with Allison before the robbery. R.J. also explained that he was the last one to enter the Clearwood house at the time of the robbery and that the first person he saw was Allison. R.J. also testified that he saw Allison running away after the robbery and that they ran to the same location.

The jury also heard a recorded jailhouse telephone call between Allison and his cousin, T.K. At the time of the call, T.K. was in jail because he had been arrested for committing the September 8 aggravated robbery. Most of the telephone call was about the aggravated robbery. Allison and T.K. referred to Jimenez during the call. They also discussed shooting someone in the head. T.K. said, "We all's in there together.," to which Allison agreed. As the majority

41

points out, the jury was well within its discretion to have inferred that Allison and T.K. were referring to the September 8 robbery.

Finally, the State presented evidence, through Juarezortega, that Allison matched Jimenez's physical description of the masked individual who participated in the aggravated robbery. So the jury heard ample evidence directly related to Allison's involvement in the September 8 robbery.

As to Reed's testimony, it was another attempt by the State to tie Allison to a different shooting that occurred four months after the charged offense. Even so, the evidence presented was insufficient to link Allison to the January 8 shooting. There were no eyewitnesses connecting Allison to the January 8 shooting. The only description of the shooter was that he had dreadlocks, which did not match Allison's description. Juarezortega even testified that he did not have enough probable cause to arrest anyone for the January 8 shooting. At best, the theory that Allison committed the January 8 shooting stemmed from weak circumstantial evidence and speculation. If anything, all it did was create a suspicion that he participated in the shooting on January 8. But Reed's out-of-court statement was unimportant for the State to advance its overall theory—that Allison participated in the aggravated robbery on September 8. Thus, the State had no real need for Reed's testimony.

As the majority also noted, the trial court gave a limiting instruction about the January 8 shooting. The jury was instructed that it was prohibited from considering the evidence unless it found beyond a reasonable doubt that Allison had committed the offense. Since there is no

42

evidence to the contrary, it is presumed that the jury followed the trial court's instructions. *See Riley v. State*, 447 S.W.3d 918, 931 (Tex. App.—Texarkana 2014, no pet.). Because the evidence trying to connect Allison to the January 8 shooting was so weak, it is likely that the jury did not consider it given the trial court's limiting instruction.

"Reviewing courts are to take into account any and every circumstance apparent in the record that logically informs the harmless error determination, and the entire record is to be evaluated in a neutral manner and not in the light most favorable to the prosecution." *Well v. State*, 611 S.W.3d 396, 410–11 (Tex. Crim. App. 2020) (citing *Love v. State*, 543 S.W.3d 835, 846 (Tex. Crim. App. 2016)). After consideration of Reed's testimony on the meaning of the phrase "pull a Carlos" in the context of the entire trial, I believe that the out-of-court statement most likely was given very little weight, if any, by the jury related to the charged offense. I certainly cannot say that there is a reasonable possibility that the admission of the complained-of evidence "moved the jury from a state of non-persuasion to one of persuasion on a particular issue" during either the guilt or punishment phases of Allison's trial. *Almaguer v. State*, 492 S.W.3d 338, 359 (Tex. App.—Corpus Christi 2014, pet. ref'd) (quoting *Scott*, 227 S.W.3d at 690–91).

As a result, my review of the entire record leads to the conclusion that the error in admitting Reed's testimony defining the phrase "pull a Carlos" was harmless beyond a reasonable doubt, and I would affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:     October 13, 2020
Date Decided:     November 17, 2021

Do Not Publish